**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 15-CV-62600-JIC**

PANKAJ PATEL and
LAKETHA WILSON, on behalf of
themselves and all others similarly situated,

Plaintiffs,

vs.

SPECIALIZED LOAN SERVICING LLC
and AMERICAN SECURITY INSURANCE
COMPANY,

Defendants.
_____________________________________________/

**DEFENDANT AMERICAN SECURITY INSURANCE COMPANY'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**

CARLTON FIELDS JORDEN BURT, P.A.
Frank Burt (Fla. Bar No. 197963)
fburt@carltonfields.com
Farrokh Jhabvala (Fla. Bar No. 765155)
fjhabvala@cfjblaw.com
Irma Reboso Solares (Fla. Bar No. 797073)
isolares@carltonfields.com
100 S.E. Second Street
Miami Tower, Suite 4200
Miami, Florida 33131-2113
Telephone: (305) 530-0050
Facsimile: (305) 530-0055

*Attorneys for Defendant American Security Insurance Company*

## Table of Contents

**Page**

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

I. Plaintiffs' Transactions. ..... 2

II. The Florida Office of Insurance Regulation Approved the Rates Used to Calculate Plaintiffs' Premiums. ..... 4

ARGUMENT ..... 4

I. The Filed Rate Doctrine Bars Plaintiffs' Claims. ..... 4

II. "Backdating" Claims Fail Because Plaintiffs' Mortgages and Federal Law Require Continuous Coverage. ..... 7

III. Plaintiffs' RICO Claims Fail as a Matter of Law. ..... 8

A. There is No Scheme to Defraud. ..... 9

1. Plaintiffs Have Pled No Facts Relating to Plaintiff Wilson. ..... 9

2. The Letters Contain Accurate Information. ..... 9

3. The Letters Were Not Reasonably Calculated to Deceive. ..... 11

B. ASIC Did Not Proximately Cause Plaintiffs' Injury. ..... 13

C. ASIC Did Not Control or Manage the Alleged RICO Enterprise. ..... 14

D. The McCarran-Ferguson Act Bars Plaintiffs' RICO Claims. ..... 15

E. Plaintiffs' Conspiracy Claim Fails. ..... 16

IV. Plaintiffs' Unjust Enrichment Claim Fails as a Matter of Law. ..... 16

A. Plaintiffs Did Not Confer a Benefit on ASIC. ..... 16

B. Plaintiffs Have an Adequate Remedy at Law. ..... 17

C. Plaintiffs Received Substantial Benefits From The Transaction. ..... 18

V. Plaintiffs' Tortious Interference with a Business Relationship Claim Fails as a Matter of Law. ..... 18

A. ASIC's Conduct Was Justified. ..... 19

B. ASIC Did Not Interfere with Plaintiffs' Mortgage Contracts. ..... 19

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Wells Fargo Bank., N.A.*,
2014 WL 345243 (W.D. Okla. Jan. 24, 2014) ....8

*Alvarez v. Royal Caribbean Cruises, Ltd.*,
905 F. Supp. 2d 1334 (S.D. Fla. 2012) ....18

*Ambrosia Coal & Const. Co. v. Pages Morales*,
482 F.3d 1309 (11th Cir. 2007) ....9

*Ampa Capital, Ltd. v. Rozen*,
2012 WL 6044299 (S.D. Fla. Dec. 5, 2012) ....18

*Anapoell v. Am. Express Bus. Fin. Corp.*,
2009 WL 766532 (10th Cir. Mar. 24, 2009) ....10

*Blackfeet Nat'l Bank v. Nelson*,
171 F.3d 1237 (11th Cir. 1999) ....15

*Brannon v. Boatmen's Nat'l Bank of Okla.*,
976 P.2d 1077 (Okla. Civ. App. 1998) ....11

*Braunstein v. Gen. Life Ins. Co.*,
2002 WL 31777635 (S.D. Fla. Nov. 19, 2002) ....16

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
116 F.3d 1364 (11th Cir. 1997) ....4

*Cannon v. Wells Fargo Bank, N.A.*,
2013 WL 3388222 (N.D. Cal. July 5, 2013) ....8

*Cannon v. Wells Fargo Bank N.A.*,
917 F. Supp. 2d 1025 (N.D. Cal. 2013) ....20

*Chinn v. PNC Bank, N.A.*,
451 F. App'x 859 (11th Cir. 2012) ....4

*City of Miami v. Bank of Am. Corp.*,
800 F.3d 1262 (11th Cir. 2015) ....17

*Clarizia v. Ocwen Fin. Corp.*,
2016 WL 439018 (S.D.N.Y. Feb. 2, 2016) ....1, 7

*Clark v. Porcelli*,
2009 WL 210859 (M.D. Fla. Jan. 27, 2009)....................15

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
290 F.3d 1301 (11th Cir. 2002)....................9

*Cohen v. Am. Sec. Ins. Co.*,
735 F.3d 601 (7th Cir. 2013)....................7, 13, 14

*Commerce P'ship 8098 Ltd. P'ship v. Equity Contr. Co.*,
695 So. 2d 383 (Fla. 4th DCA 1997)....................16

*Crichton v. Golden Rule Ins. Co.*,
576 F.3d 392 (7th Cir. 2009)....................15

*Curtis v. Cenlar FSB*,
2013 WL 5995582 (S.D.N.Y. Nov. 12, 2013)....................7

*Decambaliza v. QBE Holdings, Inc.*,
2013 WL 5777294 (W.D. Wis. Oct. 25, 2013)....................7, 8

*Diamond "S" Dev. Corp. v. Mercantile Bank*,
989 So. 2d 696 (Fla. 1st DCA 2008)....................18

*Edwards v. Prime, Inc.*,
602 F.3d 1276 (11th Cir. 2010)....................8

*Feaz v. Wells Fargo Bank, N.A.*,
745 F.3d 1098 (11th Cir. 2014)....................2, 13

*Fin. Sec. Assur., Inc. v. Stephens, Inc.*,
500 F.3d 1276 (11th Cir. 2007)....................2

*Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*,
341 F.3d 1292 (11th Cir. 2003)....................9

*Gustafson v. BAC Home Loans Servicing, LP*,
2012 WL 7051318 (C.D. Cal. Dec. 20, 2012)....................12, 14

*Haddock v. Countrywide Bank, N.A.*,
2015 WL 9257316 (C.D. Cal. Oct. 27, 2015)....................1, 7

*Hamilton v. Suntrust Mortg. Inc.*,
6 F. Supp. 3d 1312, 1317....................17

*Hill v. BellSouth Telecomms., Inc.*,
364 F.3d 1308 (11th Cir. 2004)....................4, 5

*Humana Inc. v. Forsyth*,
525 U.S. 299 (1999) ............ 15

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ............ 14

*Johnson v. Green Tree Servicing LLC*,
2015 WL 2452680 (N.D. Miss. May 22, 2015) ............ 7

*Keehn v. Carolina Cas. Ins. Co.*,
758 F.2d 1522 (11th Cir. 1985) ............ 16

*Kenty v. Bank One, Columbus, N.A.*,
92 F.3d 384 (6th Cir. 1996) ............ 13

*Kunzelmann v. Wells Fargo Bank, N.A.*,
2013 WL 139913 (S.D. Fla. Jan. 10, 2013) ............ 16, 17

*LaCroix v. U.S. Bank, N.A.*,
2012 WL 2357602 (D. Minn. June 20, 2012) ............ 8

*Lane v. Wells Fargo Bank, N.A.*,
2013 WL 269133 (N.D. Cal. Jan. 24, 2013) ............ 8

*Lawrence v. Dunbar*,
919 F.2d 1525 (11th Cir. 1990) ............ 4

*Lee v. Ocwen Loan Servicing, LLC*,
2015 WL 5449813 (S.D. Fla. Sept. 14, 2015) ............ 1, 4, 20

*Licul v. Volkswagen Grp. of Am., Inc.*,
2013 WL 6328734 (S.D. Fla. Dec. 5, 2013) ............ 18

*Lyons v. Litton Loan Servicing LP*,
2016 WL 413104 (S.D.N.Y. Feb. 2, 2016) ............ 7

*Lyons v. Litton Loan Servicing LP*,
2016 WL 415165 (S.D.N.Y. Feb. 2, 2016) ............ 1, 6

*Marshall v. City of Atlanta*,
195 B.R. 156 (N.D. Ga. 1996) ............ 15

*Mattocks v. Black Entertainment Television LLC*,
43 F. Supp. 3d 1311, 1318 (S.D. Fla. 2014) ............ 19

*McKenzie v. Wells Fargo Bank, N.A.*,
931 F. Supp. 2d 1028 (N.D. Cal. 2013) ............ 20

*McKenzie v. Wells Fargo Home Mortg., Inc.*,
2012 WL 5372120 (N.D. Cal. Oct. 30, 2012)....8

*Mega Concrete, Inc. v. Smith*,
2011 WL 1103831 (E.D. Pa. Mar. 24, 2011)....15

*Merkle v. Aetna Health, Inc.*,
2005 WL 6151455 (S.D. Fla. 2005) ....2, 10

*Miller v. Wells Fargo Bank, N.A.*,
994 F. Supp. 2d 542 (S.D.N.Y. 2014)....7, 8

*Montoya v. PNC Bank, N.A.*,
2014 WL 4248208 (S.D. Fla. Aug. 27, 2014)....15

*Morales v. Attorneys' Title Ins. Fund, Inc.*,
983 F. Supp. 1418 (S.D. Fla. 1997) ....4

*Morris v. Green Tree Servicing, LLC*,
2015 WL 4113212 (D. Nev. July 8, 2015) ....12

*Nichols v. Wm. Wrigley Jr. Co.*,
2011 WL 181458 (S.D. Fla. Jan. 19, 2011) ....18

*In re Olympia Holding Corp.*,
88 F.3d 952 (11th Cir. 1996) ....5

*Plunkett v. Poyner*,
2009 WL 5176542 (S.D. Fla. Dec. 22, 2009) ....9

*Porch v. GMAC*,
642 N.W.2d 473 (Minn. Ct. App. 2002)....10

*Prohias v. Pfizer*,
490 F. Supp. 2d 1228 (S.D. Fla. 2007) ....18, 19

*Rapp v. Green Tree Servicing, LLC*,
2013 WL 3992442 (D. Minn. Aug. 5, 2013) ....7, 8

*Reves v. Ernst & Young*,
507 U.S. 170 (1993)....14, 15

*Roberts v. Wells Fargo Bank, N.A.*,
2013 WL 1233268 (S.D. Ga. Mar. 27, 2013) ....7

*Rogers v. Nacchio*,
241 F. App'x 602 (11th Cir. 2007) ....16

*Rothstein v. Balboa Insurance Co.*,
794 F.3d 256 (2d Cir. 2015) ....................................................................................1, 5, 6

*Serchay v. State Farm Fla. Ins. Co.*,
25 So. 3d 652 (Fla. 4th DCA 2010)...................................................................................16

*Shandorf v. MCZ/Centrum Florida XIX, LLC*,
2009 WL 1024636 (S.D. Fla. Apr. 15, 2009) .......................................................................9

*Sheldon v. Okeechobee & N.W. 36th St. Corp.*,
147 So. 2d 14 (Fla. 3d DCA 1962) ....................................................................................11

*Simpson v. Sanderson Farms, Inc.*,
744 F.3d 702 (11th Cir. 2014) ...........................................................................................13

*Singleton v. Wells Fargo Bank, N.A.*,
2013 WL 5423917 (N.D. Miss. Sept. 26, 2013) ...................................................................7

*Spadaro v. City of Miramar*,
855 F. Supp. 2d 1317 (S.D. Fla. 2012) ................................................................................9

*Spears v. Colonial Bank of Ala.*,
514 So. 2d 814 (Ala. 1987)................................................................................................11

*Starkes v. Flechner*,
2012 WL 718661 (S.D. Fla. Mar. 6, 2012)...........................................................................2

*Stevens v. Union Planters Corp.*,
2000 WL 33128256 (E.D. Pa. Aug. 22, 2000) ......................................................................7

*Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co.*,
534 F. Supp. 2d 1326 (S.D. Fla. 2008) ..............................................................................15

*Taffet v. S. Co.*,
967 F.2d 1483 (11th Cir. 1992) (*en banc*) ...........................................................................4

*Trevathan v. Select Portfolio Servicing, Inc.*,
2015 WL 6913144 (S.D. Fla. Nov. 6, 2015)...............................................................1, 4, 6

*U.S. Dep't of Treasury v. Fabe*,
508 U.S. 491 (1993)...........................................................................................................15

*Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*,
996 F.2d 1534 (3d Cir. 1993) ............................................................................................14

*Validsa, Inc. v. PDVSA Servs., Inc.*,
424 F. App'x 862 (11th Cir. 2011) .....................................................................................18

*Virgilio v. Ryland Group, Inc.*,
680 F.3d 1329 (11th Cir. 2012) ....................17

*Wegoland Ltd. v. NYNEX Corp.*,
27 F.3d 17 (2d Cir. 1994) ....................5

*Weinberger v. Mellon Mortg. Co.*,
1998 WL 599192 (E.D. Pa. Sept. 10, 1998) ....................12

*In re Wiener*,
276 B.R. 810 (Bankr. N.D. Ohio 2001) ....................11

*Wilson v. Everbank, N.A.*,
2015 WL 1600549 (S.D. Fla. April 9, 2015) ....................1, 14

*Wilson v. Everbank, N.A.*,
77 F. Supp. 3d 1202 (S.D. Fla. 2015) .................... *passim*

**Statutes**

Fla. Stat. Ch. 627, Pt. I. ....................4

Fla. Stat. § 626.754 ....................11

Fla. Stat. § 626.9521(1) ....................16

Fla. Stat. § 626.9541(1)(a)(1) ....................16

Fla. Stat. § 627.031(1)(a) ....................4

Fla. Stat. § 627.062(1) ....................4

Fla. Stat. § 627.062(2)(a) ....................4

Fla. Stat. § 627.371 ....................16

Florida's Unfair Insurance Trade Practices Act ....................16

NAIC Producer Licensing Model Act, 218-1 (2005) ....................12

**Other Authorities**

12 C.F.R. Pt. 1024, Supp. I, ¶ 37(c)(1)(i) ....................8

Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act
(Regulation X), 78 Fed. Reg. 10696-01, 2013 WL 525347 (Feb. 14, 2013) ....................8

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Defendant American Security Insurance Company ("ASIC") submits this motion and memorandum of law to dismiss all claims asserted against it in the Class Action Complaint (ECF No. 1) ("Complaint") with prejudice.

**INTRODUCTION**

This case is the latest in a series of class actions brought against ASIC and its lender and loan servicer partners challenging alleged practices in connection with lender-placed insurance ("LPI"), or insurance purchased by loan servicers when borrowers fail to fulfill their contractual obligations to maintain coverage on mortgaged properties. Although they attempt to conceal their intent with reference to purported "kickbacks" and "rebates," at bottom, plaintiffs are complaining about the price of their LPI.

Recent decisions make clear that this lawsuit is ill conceived. Put simply, "LPI lawsuits face significant legal obstacles." *Lee v. Ocwen Loan Servicing, LLC*, 2015 WL 5449813, at *7 n.5 (S.D. Fla. Sept. 14, 2015). Foremost among those obstacles is the filed rate doctrine, which bars courts from addressing claims that directly or indirectly challenge filed and approved rates, or their components. In *Rothstein v. Balboa Insurance Co.*, 794 F.3d 256 (2d Cir. 2015), the first appellate decision squarely addressing the filed rate doctrine in the context of LPI, the Second Circuit dismissed LPI claims identical to those asserted here. Subsequent opinions have followed suit, "agree[ing] with the logic and conclusions" of *Rothstein*. *Trevathan v. Select Portfolio Servicing, Inc.*, 2015 WL 6913144, at *3, n.3 (S.D. Fla. Nov. 6, 2015); *see also Lyons v. Litton Loan Servicing LP*, 2016 WL 415165 (S.D.N.Y. Feb. 2, 2016); *Clarizia v. Ocwen Fin. Corp.*, 2016 WL 439018 (S.D.N.Y. Feb. 2, 2016); *Haddock v. Countrywide Bank, N.A.*, 2015 WL 9257316 (C.D. Cal. Oct. 27, 2015).

Apart from the filed rate doctrine, numerous other barriers preclude this litigation. Plaintiffs' backdating claims contravene the terms of their mortgages and multiple authorities, and are defective for a number of reasons. The McCarran-Ferguson Act bars plaintiffs' RICO claims as a threshold matter; even if it did not, plaintiffs cannot establish either mail or wire fraud, there is no proximate cause between any communication from ASIC and the alleged injury, and plaintiffs have not pled a viable enterprise. *Wilson v. Everbank, N.A.*, 77 F. Supp. 3d 1202 (S.D. Fla. 2015) ("*Wilson I*"); *Wilson v. Everbank, N.A.*, 2015 WL 1600549 (S.D. Fla. April 9, 2015) ("*Wilson II*"). Finally, "[t]he Eleventh Circuit itself has rejected LPI-related claims similar to the ones alleged here." *Lee*, 2015 WL 5449813, at *7 (citing *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1110-

11 (11th Cir. 2014)). This case should be dismissed.

## FACTUAL BACKGROUND[1]

### I. Plaintiffs' Transactions.

Plaintiffs acknowledge that their mortgages afford SLS "broad discretion." Compl. ¶ 7. "[I]f the borrower maintains an insurance policy that lapses or provides insufficient coverage, the lender has the right to 'force place' new coverage on the property and then charge the borrower the cost of coverage." *Id.*; *see also id.* ¶ 25; *id.* Ex. A ¶ 5; Ex. B ¶ 5. Plaintiffs' mortgages provide that their lender was "under no obligation to purchase any particular type or amount of coverage," and that the cost of such coverage "might significantly exceed the cost of insurance that Borrower could have obtained." *Id.* ¶¶ 49, 62; *id.* Ex. A ¶ 5; Ex. B ¶ 5.

Pankaj Patel has reaped the benefits of lender-placed insurance. He sued ASIC in 2013 to recover $15,000 for water damage under his LPI policy in effect at that time, a claim the parties resolved. Request for Judicial Notice ("RJN") Ex. A. A year later, Patel was notified that SLS had not received of insurance on his property and that if he did not provide such evidence, SLS would buy insurance and charge Patel. Declaration of Ronald K. Wilson Regarding Plaintiff Pankaj Patel ("Wilson (Patel) Decl.") Ex. 1; *see* Compl. ¶ 52.[2] That insurance, warned SLS in separate letters, "[m]ay be more expensive than the insurance you can buy yourself." Wilson (Patel) Decl. Exs. 1, 2. The letters also warned Patel that "[i]f we purchase insurance for you, **an affiliate of SLS may benefit**. . . . Highland Insurance Solutions acts as an agent for the insurance company and **will receive a commission** on the insurance we obtain. . . . The insurance company **may factor such commission into the rate charged for the coverage.**" *Id.* Exs. 1, 2 (emphasis supplied). Finally, SLS "strongly recommend[s] that you obtain your own insurance coverage." *Id.* Exs. 1, 2. Patel was repeatedly informed of the amount of the annual premiums ($9,197.79) and the period of coverage (6/8/14 – 6/8/15). *Id.* Exs. 2, 3; Compl. ¶¶ 54, 55.

---

[1] A significant portion of the Complaint is wholly unrelated to ASIC's and SLS's conduct at issue in this litigation and therefore should be stricken under Fed. R. Civ. P. 12(f). Compl. ¶¶ 2-4, 9-13, 40, 42; *Starkes v. Flechner*, 2012 WL 718661, at *4-5 (S.D. Fla. Mar. 6, 2012).

[2] The Complaint repeatedly references and expressly relies upon various letters and insurance policies sent to plaintiffs, which are attached to the Wilson declarations. *See* Compl. ¶¶ 51-55. These documents are incorporated by reference in the Complaint, there is no dispute about their contents, and the Court may consider them without converting the motion to dismiss into one for

Along with his policy, Patel was provided a fact sheet, "encourag[ing]" him to obtain his own insurance, as "the cost [for LPI] may be higher and it may only provide limited protection for you." Wilson (Patel) Decl. Ex. 3. ASIC provided the website and QR Code for the Consent Order that it entered into with the Florida Office of Insurance Regulation, and concluded the bulletin with the admonition: "**Don't let this happen. Avoid lender-placed insurance**." *Id.* (emphasis in original). The following April, Patel was again notified that SLS still had not received proof of any voluntary homeowner's insurance, and would again purchase LPI to cover his property if it did not receive such proof. *Id.* Ex. 4. That letter contained similar warnings to those previously sent. *Id.* After obtaining proof of insurance, SLS cancelled the LPI policy effective June 1, 2015. *Id.* Ex. 5.

Like Patel, Laketha Wilson was repeatedly notified that SLS required her to maintain adequate hazard insurance. Declaration of Ronald K. Wilson Regarding Plaintiff Leketha Wilson ("Wilson (Wilson) Decl.") Exs. 1, 2. SLS informed Wilson that "[t]he cost of the insurance we purchase is likely to be much higher than the cost of the insurance you could obtain on your own. . . . Obtaining your own insurance is in your best interest." *Id.* Exs. 1, 2. SLS further explained, "[p]art of the premium may be used by the insurance company to reimburse us for these expenses or pay affiliates of Specialized Loan Servicing LLC a commission." *Id.* Exs. 1, 2. SLS informed Wilson of the premium amount ($1,570.31) and the term (12/23/11 – 12/23/12). *Id.* Exs. 2, 3. When SLS received voluntary insurance information approximately two months later, it cancelled the LPI policy effective April 13, 2012. *Id.* Ex. 4.

With respect to both plaintiffs, the foundational allegations are: (i) plaintiffs entered into written mortgage agreements requiring them to maintain adequate coverage on the mortgaged properties; (ii) if plaintiffs failed in those obligations, the mortgages permitted their lenders to obtain alternative coverage with premiums that might "significantly exceed" premiums for coverage they might maintain on their own; (iii) plaintiffs failed to maintain the promised coverage; (iv) LPI was obtained through ASIC; and (v) plaintiffs were told that the cost of LPI would be higher, that an affiliate of SLS might receive a commission on the placement, and that it would be in their best interest to purchase their own coverage. Against this backdrop, plaintiffs now claim that ASIC was unjustly enriched, tortiously interfered with their business relationships, and violated RICO.

---

summary judgment. *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007); *Merkle v. Aetna Health, Inc.*, 2005 WL 6151455, at *3 n.4 (S.D. Fla. 2005).

## II. The Florida Office of Insurance Regulation Approved the Rates Used to Calculate Plaintiffs' Premiums.

The Florida Office of Insurance Regulation ("OIR") is charged with "regulating insurance rates . . . to the end that they shall not be excessive, inadequate, or unfairly discriminatory." Fla. Stat. §§ 627.031(1)(a), 627.062(1); *see generally* Fla. Stat. Ch. 627, Pt. I. Insurers "must" file "cop[ies] of rates . . . and changes thereto" with the OIR. Fla. Stat. § 627.062(2)(a). The OIR "may not directly or indirectly . . . [p]rohibit any insurer . . . from paying acquisition costs [i.e., commissions] . . . or prohibit any such insurer from including the full amount of the acquisition costs in a rate filing." *Id*. § 627.062(2)(i). ASIC filed the premium rates used to determine the amount of LPI premium charged to plaintiffs with the OIR, and the OIR approved them. Declaration of Rebecca H. Voyles ("Voyles Decl.") ¶¶ 4-9; Wilson (Patel) Decl. ¶¶ 12-20; Wilson (Wilson) Decl. ¶¶ 11-15.[3]

## ARGUMENT

## I. The Filed Rate Doctrine Bars Plaintiffs' Claims.

The essence of plaintiffs' claims is that they were "forced" "to pay *inflated* amounts for force-placed insurance through a scheme that *inflated* such amounts to cover kickbacks and expenses." Compl. ¶ 137 (emphasis supplied).[4] But "'[t]he filed rate doctrine (also known as the 'filed tariff doctrine') forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal [or state] regulatory authority.'" *Lee*, 2015 WL 5449813, at *8 (quoting *Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1315 (11th Cir. 2004)). "'Therefore, causes of action in which the plaintiff attempts to challenge the terms of a filed tariff are barred by the filed rate doctrine.'" *Id.* (quoting *Hill*, 364 F.3d at 1315); *see also Taffet v. S. Co.*,

---

[3] The Court may independently consider the Voyles and Wilson Declarations because: (1) the filed rate doctrine goes to the issue of plaintiffs' standing, *see Morales v. Attorneys' Title Ins. Fund, Inc.*, 983 F. Supp. 1418, 1429 (S.D. Fla. 1997), and this Court may consider these Declarations as part of its subject-matter jurisdiction analysis, *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990); (2) ASIC's rate filings are part of the public record filed with governmental agencies and this Court may take notice of them, *Chinn v. PNC Bank, N.A.*, 451 F. App'x 859, 860 n.1 (11th Cir. 2012); *Trevathan*, 2015 WL 6913144, at *2 (taking judicial notice of the same exhibits); and (3) ASIC's rate filings are central to the allegations and claims asserted in the Complaint, *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

[4] The rates are characterized as "inflated" over thirty times in the Complaint. Compl. ¶¶ 8, 26, 30, 35, 36, 38, 44, 45, 47, 75(d), 75(h), 75(i), 75(j), 75(n), 98(a), 98(b), 98(c), 98(h), 102, 104, 120, 137, 140, 149, 150, 154, 161, 162, 163.

967 F.2d 1483, 1490 (11th Cir. 1992) (*en banc*) (the doctrine bars civil claims alleging that a rate filed with and approved by a regulator is too high, unfair, or otherwise unlawful.). "The Supreme Court has applied the filed rate doctrine quite strictly, often with harsh results." *In re Olympia Holding Corp.*, 88 F.3d 952, 956 (11th Cir. 1996).

Twin principles underlie the filed rate doctrine: (i) nondiscrimination – preventing carriers from engaging in price discrimination as between ratepayers; and (ii) nonjusticiability – preserving the exclusive role of regulatory agencies in approving rates that are reasonable by keeping courts out of the ratemaking process, a function the agencies are more competent to perform. *Hill*, 364 F.3d at 1316. The nonjusticiability principle prevents more than judicial ratesetting; it precludes any judicial action which undermines agency ratemaking authority. *Id.* at 1317. Thus, even if a claim does not directly attack the filed rate, any award of damages to the insured that effectively would result in a judicial determination of the reasonableness of that rate is prohibited. *Id.* The nondiscrimination principle similarly prohibits damage awards which would have the effect of lowering a plaintiff's premium rate below the rate paid by other customers. *Id.* at 1316-17. The doctrine is applied strictly to prevent a plaintiff from suing even in the face of apparent inequities whenever either underlying principle is implicated. *Id.* at 1316. "Simply stated, the doctrine holds that any 'filed rate' — that is, one approved by the governing regulatory agency — is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).

Recently, the Second Circuit held that the filed rate doctrine precludes claims identical to those asserted here. In *Rothstein v. Balboa Insurance Co.*, "the plaintiffs argued that the filed rate doctrine did not bar their claims because they were attacking the fraudulent scheme, not the rates themselves." 794 F.3d at 262. That characterization was irrelevant – "a claim may be barred even if it can be characterized as challenging something other than the rate itself." *Id.* "Plaintiffs' claims in this appeal likewise rest on the premise that the rates approved by regulators were too high. After all, if [the LPI insurer] was willing to offer a 'discount' from the filed rates (through the free services it provided via [the servicer's affiliate]), those rates must have been inflated in the first place. But whether insurer-provided services should have been reflected in the calculation of LPI is not for us to say; under the nonjusticiability principle, the question is reserved exclusively to the regulators." *Id.* at 263; *Lyons*, 2016 WL 415165, at *12 (for the kickback "theory to succeed, however, the court would have to examine whether loan tracking services (or any other kickbacks) 'should have been

treated as part and parcel of the LPI transaction and *reflected in the LPI rates*.' This inquiry would violate the nonjusticiability principle, as 'it is squarely for the regulators to say what should or should not be included in a filed rate.'") (emphasis in original) (quoting *Rothstein*, 794 F.3d at 262). The *Rothstein* plaintiffs' claims also implicated the nondiscrimination principle. "While non-suing borrowers serviced by GMAC would be billed at the filed LPI rates, Plaintiffs would enjoy the discount . . . allegedly provided to GMAC. The problem is not obviated simply because Plaintiffs have brought their claims on behalf of a putative class." *Rothstein*, 794 F.3d at 263.

*Rothstein* also considered and rejected plaintiffs' argument that premiums paid through an intermediary, as is the case with all LPI transactions, are outside the doctrine. "The filed rate doctrine is not limited to transactions in which the ratepayer deals directly with the rate filer. The doctrine operates notwithstanding an intermediary that passes along the rate." *Id.* at 264. For LPI, "the rate-regulated product necessarily passes through intermediaries before the rate is paid by the ultimate consumer," so "it would make little sense for the doctrine to apply as between the rate filer and the intermediaries, but not when it comes to the ultimate ratepayers." *Id.* at 265.

Following *Rothstein*, Judge Dimitrouleas dismissed an LPI lawsuit in November 2015 asserting the same "kickback" claims brought here. Predictably, "Plaintiff argues that it is not the rate itself, but rather the 'kickback' present in the inflated rate and the Defendants' alleged 'collusion and self-dealing' that is at issue. Defendants respond that the purported distinction is meaningless." *Trevathan*, 2015 WL 6913144, at *3; *see also* Comp. ¶¶ 14, 47 (making the same points rejected in *Trevathan*). Judge Dimitrouleas agreed. Based on *Rothstein*, "the Court finds that both of Plaintiff's arguments are unavailing." *Id.* Equally predictably, "Plaintiff cites a number of similar district court cases, in which the court held that the filed-rate doctrine was inapplicable." *Id.* at *3 n.3. "Even so," said Judge Dimitrouleas, "the Eleventh Circuit has not spoken to this issue, and this Court agrees with the logic and conclusions of the subsequently-issued *Rothstein* appellate decision." *Id.*

Neither *Rothstein* nor *Trevathan* are outliers. Prior to *Rothstein*, numerous courts recognized that the filed rate doctrine bars LPI "kickback" or "rebate" claims.[5] And since *Rothstein*, various

[5] *See e.g., Johnson v. Green Tree Servicing LLC*, 2015 WL 2452680, at *2-3 (N.D. Miss. May 22, 2015); *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 553-54 (S.D.N.Y. 2014); *Curtis v. Cenlar FSB*, 2013 WL 5995582, at *3-4 (S.D.N.Y. Nov. 12, 2013); *Decambaliza v. QBE Holdings, Inc.*, 2013 WL 5777294, at *6-7 (W.D. Wis. Oct. 25, 2013); *Singleton v. Wells Fargo Bank, N.A.*,

district courts have followed the lead of the Second Circuit. In *Lyons v. Litton Loan Servicing LP*, 2016 WL 413104 (S.D.N.Y. Feb. 2, 2016), for example, Judge Carter rejected plaintiff's attempt to distinguish *Rothstein* in dismissing identical LPI claims against ASIC. *Id.* at *10-13. *See also Haddock*, 2015 WL 9257316, at *18-19 (dismissing fraud claim pursuant to the filed rate doctrine); *Clarizia*, 2016 WL 439018, at *3 (filed rate doctrine mandated dismissal of putative class lender-placed insurance claims against ASIC). All of plaintiffs' claims should be dismissed with prejudice.

## II. "Backdating" Claims Fail Because Plaintiffs' Mortgages and Federal Law Require Continuous Coverage.

Plaintiffs claim that ASIC wrongfully dated its coverage retroactively to include periods during which no claims were made. Compl. ¶¶ 30, 55, 66. To the contrary, Plaintiffs' mortgages mandate that plaintiffs "shall keep" the property insured and that the property insurance "shall be maintained in the amounts . . . and for the periods that Lender requires." Compl. Exs. A & B, ¶ 5. The mortgage also specifies that if plaintiff "fails to maintain" acceptable coverage, "Lender may obtain insurance coverage, at Lender's option and Borrower's expense," and "Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument[.]" *Id.* ¶¶ 5, 9.

Based on these contractual requirements, numerous courts have rejected identical backdating claims. As the Seventh Circuit explained:

> the loan agreement and related documents required [plaintiff] to maintain *continuous* insurance coverage on her home, and reserved to the lender the right to do "whatever it deems reasonable or appropriate to protect the [l]ender's rights in the [p]roperty," . . . This broad language includes the purchase of backdated insurance, which is necessary to maintain continuous hazard coverage on the property.

*Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 613 (7th Cir. 2013) (emphasis in original). Similarly, *Rapp v. Green Tree Servicing, LLC*, 2013 WL 3992442 (D. Minn. Aug. 5, 2013) rejected the "backdating" claim in another LPI case because:

> Backdating ensures that the property is continuously covered in the event that a loss occurs during a period of insufficient coverage. It would be reasonable for [the servicer] to acquire coverage for the entire period for which it believed [plaintiff's] property had been uninsured—including for time that had already passed—to ensure that [the servicer] would be covered in the event that [plaintiff's] condominium had

---

2013 WL 5423917, at *2-3 (N.D. Miss. Sept. 26, 2013); *Roberts v. Wells Fargo Bank, N.A.*, 2013 WL 1233268, at *13 & n.9 (S.D. Ga. Mar. 27, 2013); *Stevens v. Union Planters Corp.*, 2000 WL 33128256, at *3 (E.D. Pa. Aug. 22, 2000).

been damaged in some way during that period.

*Id.* at *6 (internal citation omitted).[6]

Plaintiffs backdating argument is also refuted by governing regulations that expressly allow "a servicer [to] charge a borrower for force-placed insurance a servicer purchased, retroactive to the first day of any period in which the borrower did not have hazard insurance in place." 12 C.F.R. Pt. 1024, Supp. I, ¶ 37(c)(1)(i) (emphasis added), Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696-01, 2013 WL 525347, at *10712 (Feb. 14, 2013); *id.* (interpreting the statutory language to allow charges to be assessed retroactively for any period in which coverage was not maintained continuously once the procedural and substantive statutory criteria are met). Given that federal regulations expressly contemplate "retroactive" placement of LPI, plaintiffs' backdating claims fail as a matter of law.

**III. Plaintiffs' RICO Claims Fail as a Matter of Law.**

RICO allegations not predicated on illegal acts "merit particular scrutiny." *Wilson I*, 77 F. Supp. 3d at 1225. "To establish a federal civil RICO violation under § 1962(c), the plaintiffs must satisfy four elements of proof: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291–92 (11th Cir. 2010) (quotations and citations omitted). Plaintiffs also must establish that they suffered injury to their "business or property" due to a violation of a substantive RICO provision. *Spadaro v. City of Miramar*, 855 F. Supp. 2d 1317, 1352 (S.D. Fla. 2012). Plaintiffs' RICO claims are fatally deficient. To the extent the content of the representations made to plaintiffs is alleged at all, the letters are accurate, not reasonably calculated to deceive, and did not proximately cause plaintiffs' injury. Nor did ASIC direct the operation of the enterprise. Further, because the application of RICO in this circumstance

---

[6] *See also Miller*, 994 F. Supp. 2d at 554-55 (backdating justified because bank cannot know whether there was damage during an uninsured period); *Cannon v. Wells Fargo Bank, N.A.*, 2013 WL 3388222, at *4 (N.D. Cal. July 5, 2013) (the Uniform Instrument contains "no limits as to the periods for which the lender may require insurance"); *McKenzie v. Wells Fargo Home Mortg., Inc.*, 2012 WL 5372120, at *20 (N.D. Cal. Oct. 30, 2012) (no support for claim that policies were "unnecessarily backdated"); *Lane v. Wells Fargo Bank, N.A.*, 2013 WL 269133, at *10 (N.D. Cal. Jan. 24, 2013) (dismissing backdating claims); *Ali v. Wells Fargo Bank., N.A.*, 2014 WL 345243, at *1 (W.D. Okla. Jan. 24, 2014) (citing *Cohen* in rejecting backdating theory); *Decambaliza*, 2013 WL 5777294, at *9 (backdated insurance had value because "a claim still could have been made with respect to some unknown damage to the property"); *LaCroix v. U.S. Bank, N.A.*, 2012 WL 2357602, at *5 (D. Minn. June 20, 2012) ("Backdating policies, however, ensures that the property is continuously covered in the event that a loss occurs during a period of insufficient coverage.").

would invalidate, impair, or supersede Florida's carefully crafted insurance regime, it is barred by the McCarran-Ferguson Act.

**A. There is No Scheme to Defraud.**

**1. Plaintiffs Have Pled No Facts Relating to Plaintiff Wilson.**

As a preliminary matter, Wilson's RICO claims must be dismissed due to an absence of any supporting factual allegations. "[A] RICO plaintiff must plead mail fraud and wire fraud with particularity in accordance with Fed. R. Civ. P. 9(b) and set forth the time, place and person responsible for each act." *Plunkett v. Poyner*, 2009 WL 5176542, at *4 (S.D. Fla. Dec. 22, 2009). This requires Wilson to plead "(1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud." *Shandorf v. MCZ/Centrum Florida XIX, LLC*, 2009 WL 1024636, at *3 (S.D. Fla. Apr. 15, 2009) (quoting *Ambrosia Coal & Const. Co. v. Pages Morales,* 482 F.3d 1309, 1316-17 (11th Cir. 2007)).

Plaintiffs never identify *any* specific statements made to Wilson, let alone who made them and when. Compl. ¶¶ 66, 146, 148, 149. She is simply lumped in with plaintiff Patel, and plaintiffs speculate that "similar letters were sent to Plaintiff Wilson." *Id.* ¶¶ 146, 148, 149. Rule 9(b) requires a plaintiff to offer more than "mere conjecture," *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 (11th Cir. 2002), which plaintiffs have failed to do.

**2. The Letters Contain Accurate Information.**

"In the Eleventh Circuit, a scheme to defraud requires proof of material misrepresentations." *Wilson I*, 77 F. Supp. 3d at 1225 (quotation omitted). "Plaintiffs must establish that the defendant 'had a conscious, knowing intent to defraud and that a reasonably prudent person would have been deceived by its misrepresentations' which amounts to 'the same showing of reasonable reliance that is required for establishing common law fraud.'" *Id.* at 1225 (quoting *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.,* 341 F.3d 1292, 1306 (11th Cir. 2003)).

Where the communications with plaintiff contain "accurate information," they are not "deceptive," and cannot serve as predicate acts. *Merkle*, 2005 WL 6151455, at *3 (dismissing RICO claims with prejudice where "[t]here appears to be no dispute that the EOB's contain accurate information-that is, the amount stated on the EOB is the amount paid."). In *Merkle,* this Court found that explanation of benefit letters (EOBs) "cannot form the basis of a claim of mail or wire fraud as predicate acts under RICO" where they "are accurate but reflect undisclosed changes in rate

calculations." *Id.* at *4.

Plaintiffs' RICO claim is grounded on two supposed misrepresentations: (1) that the premiums charged were the "true cost" of LPI coverage (Compl. ¶¶ 148, 143), and (2) that ASIC supposedly "fostered the mistaken impression that SLS was actively 'obtaining' a policy . . . when in fact no work was done." *Id.* ¶¶ 144; 147. But each of those representations is accurate.

With respect to the representations about "cost," plaintiffs acknowledge that their mortgages allow the lender to "charge the borrower for the cost of the premium," and warn them that "the cost of the insurance coverage so obtained might significantly exceed the cost of the insurance that Borrower could have obtained." Compl. ¶¶ 25, 49, 62 (quoting Exs. A & B ¶ 5). Plaintiffs then torture the meaning of "cost," claiming that the lender was only permitted to charge them premiums less those particular expenses (which are components of the filed rate) with which plaintiffs take issue. Compl. ¶ 148. Not only do the authorities that have considered this issue disagree, this argument perfectly highlights why the filed rate doctrine bars plaintiffs' claims – because the OIR has the expertise to review expenses, commissions, and other components of a rate to determine what is reasonable.

The Minnesota Court of Appeals in an auto LPI case opined:

> [W]e find it difficult to construe the broad terms "the cost of insurance" as requiring some rate different from the one MIC [the insurer] filed with the appropriate insurance regulators. In the absence of specific limiting terms, *we construe the words "the cost of insurance" to mean the premium rates paid by GMAC [the lender] to MIC, pursuant to rate filings made by MIC with appropriate insurance regulators. Because Porch [the borrower] makes no claim that the premiums MIC charged to GMAC were not calculated according to the filed rates, we conclude that the premium was not excessive and that it was the cost of the insurance to GMAC.*

*Porch v. GMAC*, 642 N.W.2d 473, 480 (Minn. Ct. App. 2002) (emphasis added); *see also Anapoell v. Am. Express Bus. Fin. Corp.*, 2009 WL 766532, at *3 (10th Cir. Mar. 24, 2009) (affirming in LPI context rejection of any "unwritten requirement that Defendants may only 'pass on' their actual insurance-related expenses to Dr. Anapoell."); *Brannon v. Boatmen's Nat'l Bank of Okla.*, 976 P.2d 1077, 1080 (Okla. Civ. App. 1998) (nothing "wrongful" where the insurance premium charged by the insurer was then charged to the borrower, even if a portion of that premium included a commission to the lender). In another auto LPI case, the Supreme Court of Alabama noted that the payment of a 50% commission out of the premium did not render such payment a kickback or the payment inappropriate. *Spears v. Colonial Bank of Ala.*, 514 So. 2d 814, 816 (Ala. 1987) ("a

premium may include the commission paid to the seller of the insurance.").

As for the "mistaken impression" that SLS was "actively obtaining a policy," plaintiffs' claim boils down to an assertion that SLS did no "work" to obtain each individual certificate. Compl. ¶ 144. But the law governing insurance does not incorporate any such "equivalent value" analysis. Instead, insurance "producers" are compensated for "producing" insurance relationships that results in the issuance of coverage and payment of premium. In the LPI context, the agency initiates and negotiates the insurance relationship under which individual certificates are issued, as well as fostering the relationship between the servicer and LPI underwriter. This "procuring cause" analysis is the relevant standard. *See Sheldon v. Okeechobee & N.W. 36th St. Corp.*, 147 So. 2d 14, 15 (Fla. 3d DCA 1962) ("[A] broker's commission is earned at the time he either procures a purchaser ready, willing and able to buy or lease, or consummates a sale or lease").[7]

Plaintiffs cannot plausibly allege that the commissions were unearned while repeatedly alleging that SLS received commissions for procuring the policies at issue. Compl. ¶¶ 96 (SLS "is permitted to unilaterally choose the company from which it purchases FPI and negotiates the price for the coverage it procures"), 140. Because SLS "earned" the commissions through the procurement of the overall group master policy arrangement, followed by satisfaction of a condition subsequent through payment of premium on individual certificates of insurance issued pursuant to that group master policy arrangement, ASIC fostered no "mistaken impression" through its letters.

**3. The Letters Were Not Reasonably Calculated to Deceive.**

The letters sent to plaintiffs contained, *inter alia*, the following warnings:

- "If we purchase insurance for you, *an affiliate of SLS may benefit*. . . . Highland Insurance Solutions acts as an agent for the insurance company and *will receive a commission* on the insurance we obtain. . . . The insurance company *may factor such commission into the rate charged for the coverage*." Wilson (Patel) Decl. Exs. 1, 2 (emphasis supplied).

[7] Florida statutes reiterate the "procuring cause" analysis. Specifically, Fla. Stat. § 626.754 provides that an agent, following termination of employment with an insurer, may continue to receive commissions for "policies written by him or her for the insurer during the existence of appointment." Similarly, agents often "earn" and receive commissions when policies are renewed, which "do[es] not necessarily require the rendering of any future services." *In re Wiener*, 276 B.R. 810, 816 (Bankr. N.D. Ohio 2001). This point is further illustrated by the National Association of Insurance Commissioners ("NAIC") Model Act which allows for insurers to pay commissions to individuals "who do not sell, solicit, or negotiate insurance in this state." NAIC Producer Licensing Model Act, 218-1, § 13.D (2005).

- "Part of the premium may be used by the insurance company to reimburse us for these expenses or pay affiliates of Specialized Loan Servicing LLC a commission." Wilson (Wilson) Decl. Exs. 1, 2.
- SLS "strongly recommend[s] that you obtain your own insurance coverage." Wilson (Patel) Decl. Exs. 1, 2, 4. "Obtaining your own insurance is in your best interest." Wilson (Wilson) Decl. Ex. 1.
- "**Don't let this happen. Avoid lender-placed insurance**." Wilson (Patel) Decl. Ex. 3 (emphasis in original).
- LPI "[m]ay be more expensive than the insurance you can buy yourself." Wilson (Patel) Decl. Exs. 1, 2, 4; *see also id.* Ex. 3; Wilson (Wilson) Decl. Exs. 1, 2.
- The amount and period of coverage. Wilson (Patel) Decl. Exs. 2, 3; Wilson (Wilson) Decl. Exs. 2, 3.

This Court has rejected plaintiffs' theory that similar letters were reasonably calculated to deceive:

> Plaintiffs admit that [the lender] had the right to place hazard coverage and to charge considerably more than what Plaintiffs would have paid had they fulfilled their insurance obligations. They admit that Defendants warned and disclosed to Plaintiffs that their voluntary coverage lapsed and when it lapsed; that they had an obligation to maintain coverage; that if they did not maintain coverage on their own, [the lender] would obtain a policy on their property; that the force-placed policy would cost substantially more; that the force-placed policy would inure to [the lender's] benefit; and that the increased amount would be charged by [the lender] to Plaintiffs. "The Court cannot see how letters that warn of an imminent bad deal and urge one to seek better could possibly be calculated to deceive anyone."

*Wilson I*, 77 F. Supp. 3d at 1226-27 (quoting *Weinberger v. Mellon Mortg. Co.*, 1998 WL 599192, at *5 (E.D. Pa. Sept. 10, 1998)).[8] And in *Feaz v. Wells Fargo Bank, N.A.*, the Eleventh Circuit, relying on a prior Seventh Circuit LPI decision, rejected a similar claim:

> The allegations that Wells Fargo violated its fiduciary duty and committed fraud by charging Feaz a commission, a "kickback," or "other compensation"—any amount above the net cost to Wells Fargo of obtaining the force-placed flood insurance—also fails . . . because Wells Fargo disclosed that Feaz would incur higher costs if it

---

[8] *See also Morris v. Green Tree Servicing*, LLC, 2015 WL 4113212, at *12 (D. Nev. July 8, 2015) (dismissing a RICO claim in an LPI case because the cycle letters could not deceive a reasonably prudent person); *Gustafson v. BAC Home Loans Servicing, LP*, 2012 WL 7051318, at *7 (C.D. Cal. Dec. 20, 2012) ("the Court fails to see how Defendants' failure to inform Plaintiffs and class members that force-placed insurance practices also generated profits for Defendants is a material omission 'reasonably calculated to deceive' Plaintiffs"); *Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 390-91 (6th Cir. 1996) (alleged "kickbacks" for automobile LPI policies, where lender disclosed that borrowers would be charged for LPI, could not support a civil RICO fraud claim).

> force-placed the insurance for her. We agree with the Seventh Circuit that "simply calling a commission a kickback doesn't make it one. The defining characteristic of a kickback is divided loyalties. But [the lender] was not acting on behalf of [the borrower] or representing her interests. The loan agreement makes it clear that the insurance requirement is for the lender's protection."

745 F.3d 1098, 1110-11 (11th Cir. 2014) (quoting *Cohen*, 735 F.3d at 611). The same analysis applies here. Maintaining property insurance was plaintiffs' contractual obligation, which they failed to fulfill. As in *Feaz, Cohen*, and *Wilson I*, defendants disclosed to plaintiffs that, in placing LPI, their lender was not acting on plaintiffs' behalf, but was protecting its own interests. Wilson (Wilson) Decl. Exs. 1-4; Wilson (Patel) Decl. Exs. 1-3; *Feaz*, 745 F.3d at 1110-11; *Cohen*, 735 F.3d at 611. Letters that repeatedly and emphatically warned plaintiffs about the price of LPI, and actively encourage them to obtain their own coverage instead, cannot plausibly be said to be calculated to deceive. Because the letters are the bedrock of plaintiffs' RICO claims, those claims must be dismissed.

### B. ASIC Did Not Proximately Cause Plaintiffs' Injury.

To recover for an alleged violation of RICO, plaintiffs must also assert that defendants' alleged racketeering activity proximately caused their injuries. *Wilson I*, 77 F. Supp. 3d at 1225; *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 704, 712 (11th Cir. 2014). Judge Bloom recently found causation to be utterly lacking in an identical context:

> Plaintiffs have not plausibly alleged that [the lender's] "scheme" proximately caused injury to Plaintiffs. [The lender's] alleged scheme consisted of urging Plaintiffs to adhere to their obligations and to obtain coverage or risk being charged significantly more for less coverage—and then, allegedly, including as some fraction of the charge for that coverage unearned commissions masked as authorized costs. Taking the allegations as true, it is simply not plausible that Plaintiffs' injuries in paying for the unauthorized charges were proximately caused by Defendants' allegedly improper scheme. Plaintiffs have not even alleged with the requisite plausibility that, but for [the lender's] allegedly fraudulent conduct regarding the force-placed insurance charges—which added only a fraction to the insurance charges that Plaintiffs readily admit would have in any event been significantly more expensive than market-available coverage—Plaintiffs would not have paid the full force-placed insurance charges but, rather, would have opted either to now get their own insurance (as they were required but failed to do in the first place and after repeated admonition to do so) or contest the fractional, unauthorized charge.

*Wilson I*, 77 F. Supp. 3d at 1227 (citing *Gustafson*, 2012 WL 7071488, at *7). The Seventh Circuit similarly held that, "[t]he common premise underlying these allegations is that if [plaintiff] had known of the supposed kickbacks, she would not have paid the premiums for the lender-placed

insurance. . . . Her theory of damages seems to be that had she known the charges were really kickbacks, she would have breached her contractual duty to pay. That is senseless." *Cohen*, 735 F.3d at 614.

Further breaking the chain of causation, the Complaint is conspicuously silent about whether plaintiffs received or read the alleged misrepresentations. *See, e.g.*, Compl. ¶¶ 51-54, 66. "[T]he fact that Plaintiffs never read them severs any causal link between the alleged mail fraud and Plaintiffs' injuries in paying improperly inflated insurance costs. Those communications could not have furthered the Defendants' force-placed insurance scheme if Plaintiffs never received or read them. In other words, Plaintiffs have not alleged that their injuries 'flowed directly' (or at all) from the predicate pattern of racketeering activity—the sending through the mails of lender-places insurance forms, notices and letters containing the alleged misrepresentations and omissions." *Wilson II*, 2015 WL 1600549, at *6. If plaintiffs had read the letters, the only reasonably foreseeable effect would have been plaintiffs' purchase of their own insurance coverage to avoid the alleged harm. Accordingly, plaintiffs have failed to plead proximate causation of injury.

**C. ASIC Did Not Control or Manage the Alleged RICO Enterprise.**

"Mere association with an enterprise does not violate § 1962(c)." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370 (3d Cir. 2010). A defendant must "participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). RICO liability "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Id.* (emphasis in original). The RICO defendant "must knowingly engage in '*directing* the enterprise's affairs' through a pattern of racketeering activity." *Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993) (quoting *Reves*, 507 U.S. at 179 (emphasis in original)).

Plaintiffs point to a variety of actions that they claim evidence SLS and ASIC's direction or control, Compl. ¶ 140, but upon closer scrutiny it is clear that ASIC was simply conducting its everyday business activities as an insurer. *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399-400 (7th Cir. 2009) (dismissing RICO claims where the alleged "enterprise" was simply "the ordinary operation of a garden-variety marketing arrangement"); *Mega Concrete, Inc. v. Smith*, 2011 WL 1103831, at *10 (E.D. Pa. Mar. 24, 2011) (negotiating contract terms and prices, entering into business arrangements for profit, and supplying insurance and ancillary services "are all activities

consistent with the existence of a typical contracting relationship").[9] Another court in this District has rejected similar allegations in a virtually identical LPI case for failure to allege direction by ASIC of the alleged RICO enterprise. *Montoya v. PNC Bank, N.A.*, 2014 WL 4248208, at *20-21 (S.D. Fla. Aug. 27, 2014).

**D. The McCarran-Ferguson Act Bars Plaintiffs' RICO Claims.**

Finally, because the application of RICO in this circumstance would "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance," plaintiffs' RICO claims are precluded by the McCarran-Ferguson Act. 15 U.S.C. § 1012(b). The Act bars application of a federal law, such as RICO, when three elements are present: (1) the federal statute at issue does not "specifically relate[] to the business of insurance;" (2) the state statutes at issue were "enacted for the purpose of regulating the business of insurance;" and (3) application of the federal law would "invalidate, impair or supersede" the state law. *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 500-01, 505 (1993); *Blackfeet Nat'l Bank v. Nelson*, 171 F.3d 1237, 1244 (11th Cir. 1999). Each of these elements is satisfied here.

First, RICO is a federal law that does not "specifically relate[] to the business of insurance." *Humana Inc. v. Forsyth*, 525 U.S. 299, 307 (1999). Second, Florida specifically regulates the premiums at issue, and provides for enforcement and administrative relief through the OIR and Fla. Stat. § 627.371. Florida also regulates the particular conduct at issue: "misrepresentation" of insurance policies, including "[k]nowingly making . . . any . . . statement . . . [that m]isrepresents the . . . terms of any insurance policy" is forbidden under Florida's Unfair Insurance Trade Practices Act ("FUITPA"). Fla. Stat. §§ 626.9541(1)(a)(1), 626.9521(1).

Finally, Florida regulates the conduct alleged by plaintiffs in a manner that is very different than that provided in the federal RICO statutes, and application of RICO here will impair Florida's insurance regulatory scheme. Florida provides insureds with a clear avenue in section 627.371 to complain to the OIR about excessive premium charges, and the administrative remedy provided in

---

[9] *See also Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co.*, 534 F. Supp. 2d 1326, 1338-39 (S.D. Fla. 2008) (dismissing RICO claim because plaintiff did not allege that bank defendant participated in the operation or management of the enterprise); *Marshall v. City of Atlanta*, 195 B.R. 156, 173-74 (N.D. Ga. 1996) (dismissing RICO claim because plaintiff failed to allege that defendants had a "role in managing or directing the affairs of the alleged enterprise"); *Clark v. Porcelli*, 2009 WL 210859, *2 (M.D. Fla. Jan. 27, 2009) (dismissing RICO claim because plaintiff

that section is the exclusive manner of challenging insurance rates and premiums under Florida law. *See, e.g.*, *Serchay v. State Farm Fla. Ins. Co.*, 25 So. 3d 652, 654 (Fla. 4th DCA 2010). The failure to exhaust the remedies afforded by section 627.371 necessitates dismissal of the claims. *Id.* at 655; *Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 WL 139913, at *12 (S.D. Fla. Jan. 10, 2013). Moreover, Florida provides no private right of action for alleged violations of sections 626.9541(1)(a), (b) and (e), and provides a private right of action for violation of § 626.9541(1)(o) only if specific requirements are fulfilled. *See Keehn v. Carolina Cas. Ins. Co.*, 758 F.2d 1522, 1524 (11th Cir. 1985). "In allowing civil lawsuits, FUITPA contains procedural and substantive restrictions that conflict with RICO's remedy provisions." *Braunstein v. Gen. Life Ins. Co.*, 2002 WL 31777635, at *4 (S.D. Fla. Nov. 19, 2002).

**E. Plaintiffs' Conspiracy Claim Fails.**

Plaintiffs' conspiracy claim under section 1962(d) suffers the same fate as their 1962(c) claim. "Plaintiffs cannot state a claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO." *Wilson I*, 77 F. Supp. 3d at 1227 n.4; *Rogers v. Nacchio*, 241 F. App'x 602, 609 (11th Cir. 2007).

**IV. Plaintiffs' Unjust Enrichment Claim Fails as a Matter of Law.**

To prevail on a claim for unjust enrichment, plaintiffs must show that:

> (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.

*Commerce P'ship 8098 Ltd. P'ship v. Equity Contr. Co.*, 695 So. 2d 383, 386 (Fla. 4th DCA 1997). Plaintiffs fail to satisfy the basic elements of this claim: that they conferred a benefit on ASIC. Moreover, this equitable claim is entirely subsumed in their other causes of action and plaintiffs received a substantial benefit from the transaction. Thus their unjust enrichment claim fails as a matter of law.

**A. Plaintiffs Did Not Confer a Benefit on ASIC.**

Plaintiffs simply do not plead that they conferred a benefit on ASIC. The Complaint is intentionally vague, pleading that ASIC obtained "funds related to" LPI. Compl. ¶ 110. ASIC is alleged to have received "below-cost payments" from SLS for providing "mortgage servicing

---

failed to sufficiently allege that the defendant had "some part in directing the affairs of the

functions" – payments that elsewhere in the Complaint are described as kickbacks *to SLS*. *Id.* ¶¶ 111, 5. And plaintiffs outright allege in their unjust enrichment claim that ASIC paid "kickbacks" *to SLS*. *Id.* ¶¶ 111, 112.[10] The Complaint nowhere describes the benefit that *plaintiffs* have *conferred directly upon ASIC*, however. *See, e.g.*, *Kunzelmann*, 2013 WL 139913, at *6 (unjust enrichment claim in LPI case fails due to lack of a direct payment from the homeowner to the insurer).

To the extent they seek to recover any benefit to ASIC (rather than benefits that ASIC has allegedly conferred on SLS), they specifically identify the payments that SLS made to ASIC for tracking services (Compl. ¶ 111) – payments that plaintiffs describe as governed by separate contracts entered into well before their individual transactions. Compl. ¶¶ 27, 31 ("the agreements between SLS and ASIC, which govern the mortgage servicing functions that ASIC performs as well as the procurement of the master policy, [] are executed and already in place before the borrower's coverage lapses.").[11] But the Eleventh Circuit has rejected this theory of liability for unjust enrichment. *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1287 (11th Cir. 2015); *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012). Just as in *City of Miami* and *Virgilio*, the alleged benefits flow from an entirely separate services contract from the plaintiffs' transactions. *See* Compl. ¶¶ 111, 112, 31, 37-38. Accordingly, that claim should be dismissed.

**B. Plaintiffs Have an Adequate Remedy at Law.**

Unjust enrichment is an equitable doctrine. As a result, in order to state a claim for unjust enrichment, Plaintiff must not have an adequate remedy at law. *Ampa Capital, Ltd. v. Rozen*, 2012 WL 6044299, at *4 (S.D. Fla. Dec. 5, 2012). But plaintiffs have an adequate legal remedy: they are "seeking damages for the same conduct in Count [IV] as in Count[s V, VII & VIII], and there is nothing to suggest that prevailing on Count[s V, VII & VIII] would be inadequate to compensate Plaintiff." *Id.*; *see also Nichols v. Wm. Wrigley Jr. Co.*, 2011 WL 181458, at *5 (S.D. Fla. Jan. 19,

enterprise") (citation omitted).

[10] In a move that transforms pleading in the alternative to pleading two completely different factual scenarios, plaintiffs claim in their unjust enrichment claim against SLS that "ASIC and its affiliates were mere conduits for the delivery of the kickbacks and improper charges to SLS or its affiliates," *id.* ¶ 103, but in their unjust enrichment claim against ASIC, it was "SLS [that] acted as a mere conduit for the delivery of funds to ASIC." *Id.* ¶ 113.

[11] Plaintiffs' claims are thus significantly different from those in *Hamilton*, where those plaintiffs "do not, according to their complaint, seek to recover any money that [the servicer] may have paid to the [insurer] Defendants for other services under entirely separate contracts." *Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1312, 1317 & n.2 (S.D. Fla. 2014).

2011). "[W]here the unjust enrichment claim relies upon the same factual predicates as a plaintiff's legal causes of action, it is not a true alternative theory of relief but rather is duplicative of those legal causes of action." *Licul v. Volkswagen Grp. of Am., Inc.*, 2013 WL 6328734, at *7 (S.D. Fla. Dec. 5, 2013). "That Plaintiffs' [other] claims may also prove without merit does not impact whether their unjust enrichment claim should be dismissed as duplicative." *Id.* at *8 n.2. Because Plaintiffs have an adequate legal remedy, their unjust enrichment claims should be dismissed.[12]

**C. Plaintiffs Received Substantial Benefits From The Transaction.**

A claim for unjust enrichment is not available where the plaintiff has derived a substantial benefit from the payments resulting in the alleged unjust enrichment. *Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. Supp. 2d 1334, 1341 (S.D. Fla. 2012) (plaintiffs' unjust enrichment claim was precluded because they had been on board ship for their cruises, thus obtaining a benefit of the contract for carriage by sea); *Prohias v. Pfizer*, 490 F. Supp. 2d 1228, 1236 (S.D. Fla. 2007) (plaintiffs failed to state an unjust enrichment claim because they had paid for and received a cholesterol reducing drug). Plaintiffs paid for and received insurance coverage. The insurance provided a valuable benefit to plaintiffs, as it protected their houses against loss during a period when plaintiffs had no such protection. While neither plaintiff has yet brought a claim under the policies at issue, Patel brought a claim under an earlier ASIC policy for water damage to his property. *See* RJN Ex. A. Any allegation that they would have sought other insurance coverage "is too little too late—they have already received the benefit from [the insurance policies], even if they now claim that they do not want that bargain." *Prohias*, 490 F. Supp. 2d at 1236.

**V. Plaintiffs' Tortious Interference with a Business Relationship Claim Fails as a Matter of Law.**

"[T]he elements of tortious interference with a contractual relationship are: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages resulting from the breach." *Mattocks v. Black Entertainment Television LLC*, 43 F. Supp. 3d 1311, 1318 (S.D. Fla. 2014). Yet again, plaintiffs' claim fails to meet the essential elements of this cause of action: the existence of a contract and the absence of justification.

[12] The unjust enrichment claim also fails because express written contracts govern the subject of the dispute. *Validsa, Inc. v. PDVSA Servs., Inc.*, 424 F. App'x 862, 873 (11th Cir. 2011); *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st DCA 2008).

**A. ASIC's Conduct Was Justified.**

For interference with a contract to be *un* justified, "the interfering defendant must be a third party, a stranger to the business relationship." *Id.* at 1319 (internal quotations omitted). A party is not a "stranger" when it has "any beneficial or economic interest in, or control over, that relationship." *Id.* An exception to this rule exists "where malice is the *sole* basis for the interference"—that is, when the defendant is "interfering *solely* out of spite, to do harm, or for some other bad motive." *Id.* (emphasis in original).

ASIC had a beneficial or economic interest in the relationship between plaintiffs and SLS. As pled in the Complaint, ASIC provides various "mortgage servicing functions" for their mortgages, including "monitor[ing] its mortgage portfolio and force plac[ing] insurance when a borrower's voluntary insurance lapses." Compl. ¶ 27. In furtherance of those duties, ASIC is alleged to have sent plaintiffs letters regarding their insurance. *Id.* ¶ 52. ASIC is anything but a "stranger" to the relationship between plaintiffs and SLS.

Nor is malice the sole basis for ASIC's purported interference. According to the Complaint, ASIC and SLS entered into a legitimate business transaction that "ha[s] little or nothing to do with force-placed insurance" and provided for ASIC to engage in activity that was required by law and the mortgage contracts. Compl. ¶¶ 17, 27-28, 37. It is ASIC's business to "contract[] with lenders to act as a force-placed insurance vendor. Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed or is deemed deficient." *Id.* ¶ 17. Placing insurance was simply one of those activities, and one that is not in itself illegal, fraudulent, or in violation of plaintiffs' mortgage terms. *Id.* ¶ 25. Rather, ASIC was obligated pursuant to its relationship with SLS to place insurance where the homeowner did not provide evidence of acceptable coverage, and was required under Florida law to charge the filed and approved rates. Because ASIC had a beneficial and economic interest in the relationship between plaintiffs and SLS, and did not interfere in that relationship solely for some bad motive, it did not tortuously interfere with plaintiffs' business relationship.

**B. ASIC Did Not Interfere with Plaintiffs' Mortgage Contracts.**

An even more basic reason supports dismissal: plaintiffs do not have mortgage contracts with SLS. In support of their tortious interference claim, Plaintiffs claim that they have "business and contractual relationships with SLS pursuant to the mortgage contracts," and that they have certain

rights under these mortgage contracts, such as the "right not to be charged exorbitant charges." Compl. ¶ 118. ASIC is said to have knowingly interfered with plaintiffs' rights under these "mortgage contracts" by providing kickbacks to SLS. *Id.* ¶ 120.[13]

Plaintiffs' mortgages are with their "Lender," IndyMac Bank, F.S.B. and Countrywide Home Loans, Inc., respectively. Compl. Exs. A, B. Conversely, "SLS is a third-party loan servicer," and is not a party to the mortgage contracts. Compl. ¶ 1. Other LPI decisions recognize the distinction. *See, e.g.*, *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1052 (N.D. Cal. 2013) (under Florida law, the servicer "was not a contracting party."); *McKenzie v. Wells Fargo Bank, N.A.*, 931 F. Supp. 2d 1028, 1036 (N.D. Cal. 2013) (servicer "was not a party to the contract[]"). Because plaintiffs cannot meet the elements of the tortious interference claim, it should be dismissed with prejudice.

## CONCLUSION

While plaintiffs' Complaint may have "withst[ood] a motion to dismiss by 'a razor-thin margin,'" in years past, the "'strong headwinds'" prophesized by this court testing plaintiffs' "'less-than-obvious causation theory'" and other questionable claims have since become an impassible storm. *Lee*, 2015 WL 5449813, at *7 (internal quotations omitted). Plaintiffs simply cannot avoid the on-point authority militating the Complaint's dismissal. Because their claims cannot be saved by amendment, ASIC respectfully requests that the claims against it be dismissed with prejudice.

[13] Plaintiffs' claim is not that ASIC tortiously interfered with their mortgages in the abstract, but puts the mortgage contracts "with SLS" at issue. Compl. ¶¶ 118-21.

Date: February 16, 2016

Respectfully submitted,

CARLTON FIELDS JORDEN BURT, P.A.

*/s/ Frank Burt*
Frank Burt (Fla. Bar No. 197963)
fburt@carltonfields.com
Farrokh Jhabvala (Fla. Bar No. 765155)
fjhabvala@carltonfields.com
Irma Reboso Solares (Fla. Bar No. 797073)
isolares@carltonfields.com
100 S.E. Second Street
Miami Tower, Suite 4200
Miami, Florida 33131-2113
Telephone: (305) 530-0050
Facsimile: (305) 530-0055

Dawn B. Williams (pro hac vice)
dwilliams@carltonfields.com
1025 Thomas Jefferson St. NW, Suite 400E
Washington, D.C. 20007
Telephone: (202) 295-6518
Facsimile: (202) 965-8104

*Attorneys for Defendant American Security Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendant American Security Insurance Company's Motion to Dismiss was served on all counsel of record electronically via CM/ECF, on February 16, 2016.

*/s/ Frank Burt*
Frank Burt

**SERVICE LIST**

*Pankaj Patel and Laketha Wilson v. Specialized Loan Servicing LLC and American Security Insurance Company*, Case No. 15-cv-62600-JIC

Adam M. Moskowitz, Esq.
amm@kttlaw.com
Thomas A. Tucker Ronzetti, Esq.
tr@kttlaw.com
Rachel Sullivan, Esq.
rs@kttlaw.com
Robert J. Neary, Esq.
rn@kttlaw.com
**KOZYAK TROPIN & THROCKMORTON**
2525 Ponce de Leon Boulevard
Suite 900
Coral Gables, FL 33134-6036
Tel: (305) 372-1800 / Fax: (305) 372-3508

*Counsel for Plaintiffs*

Lance August Harke, Esq.
lharke@harkeclasby.com
Sarah Clasby Engel, Esq.
sengel@harkeclasby.com
Howard Mitchell Bushman, Esq.
hbushman@harkeclasby.com
**HARKE CLASBY & BUSHMAN LLP**
9699 NE Second Avenue
Miami Shores, FL 33138
Tel: (305) 536-8222 / Fax: (305) 536-8229

*Counsel for Plaintiffs*

Aaron Samuel Podhurst, Esq.
apodhurs@podhurst.com
Peter Prieto, Esq.
pprieto@podhurst.com
John Gravante, III, Esq.
jgravante@podhurst.com
Matthew Weinshall, Esq.
mweinshall@podhurst.com
**PODHURST ORSECK, P.A.**
City National Bank Building
25 W Flagler Street, Suite 800
Miami, FL 33130-1780
Tel: (305) 358-2800 / Fax: (305) 358-2382

*Counsel for Plaintiffs*

Archie Cleveland Lamb, Jr., Esq.
alamb@archielamb.com
**ARCHIE LAMB, ASSOCIATES**
P.O. Box 2088
Birmingham, AL 35201
Tel: (205) 612-6789 / Fax: (205) 314-0785

*Counsel for Plaintiffs*

103439279.3