**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 0:15-cv-62600-JIC**

PANKAJ PATEL and
LAKETHA WILSON, on behalf of
Themselves and all others similarly situated,

Plaintiffs,

v.

SPECIALIZED LOAN SERVICING LLC
and AMERICAN SECURITY INSURANCE
COMPANY,

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF SPECIALIZED LOAN SERVICING LLC'S MOTION TO DISMISS COMPLAINT**

**TABLE OF CONTENTS**

**Page**


PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 2

I. THE FILED RATE DOCTRINE BARS ALL CLAIMS ..... 2

II. PLAINTIFFS HAVE NOT ADEQUATELY PLED A CLAIM FOR BREACH OF CONTRACT ..... 5

- A. SLS Is Not A Party To the Contract ..... 5
- B. Plaintiffs Have Not Pled A Viable Breach By SLS ..... 7
- C. Plaintiffs Did Not Perform Under The Mortgages ..... 9

III. PLAINTIFFS HAVE NOT ADEQUATELY PLED A CLAIM FOR BREACH OF THE IMPLIED COVENANT ..... 10

IV. PLAINTIFFS HAVE NOT PLED A TILA CLAIM ..... 12

V. PLAINTIFFS HAVE NOT PLED A RICO CLAIM ..... 14

- A. Plaintiffs Have Not Successfully Alleged Mail And Wire Fraud ..... 14
- B. Plaintiffs Have Not An Pled Proximate Causation ..... 16
- C. Plaintiffs Have Not Pled A Viable "Enterprise" ..... 18
- D. Plaintiffs Fail To State A Claim For Conspiracy To Violate RICO ..... 19

VI. PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT ..... 19

VII. PLAINTIFFS HAVE NOT PLED A FDUTPA CLAIM ..... 20

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. GMAC Mortg. Corp. of Pa.*,
1994 WL 702639 (N.D. Ill. Dec. 14, 1994) ....................13

*Anapoell v. Am. Express Bus. Fin. Corp.*,
2009 WL 766532 (10th Cir. Mar. 24, 2009) ....................7

*Anthony v. Anthony*,
642 F. Supp. 2d 1366 (S.D. Fla. 2009) ....................12

*Arnett v. Bank of Am., N.A.*,
874 F. Supp. 2d 1021(D. Or. 2012) ....................13

*Ashcroft v. Iqbal*,
556 US 662 (2009) ....................11

*Babul v. Golden Fuel, Inc.*,
990 So. 2d 680 (Fla. Dist. Ct. App. 2008) ....................6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................11

*Boyle v. United States*,
556 U.S. 938 (2009) ....................18

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) ....................17

*Bruggermann v. Amacore Grp., Inc.*,
2010 WL 2696230 (M.D. Fla. July 6, 2010) ....................10

*Burdick v. Bank of Am., N.A.*,
99 F. Supp. 3d 1372 (S.D. Fla. 2015) ....................7

*Burger King Corp. v. Ashland Equities, Inc.*,
217 F. Supp. 2d 1266 (S.D. Fla. 2002) ....................11

*Burger King Corp. v. Weaver*,
169 F.3d 1310 (11th Cir. 1999) ....................10, 11

*Cannon v. Wells Fargo Bank N.A.*,
917 F. Supp. 2d 1025 (N.D. Cal. 2013), dismissed ....................6, 8

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) ....................18

*Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*,
420 F.3d 1146 (11th Cir. 2005) ....................10

*Chastain v. N.S.S. Acquisition Corp.*,
2009 WL 1971621 (S.D. Fla. July 8, 2009) ....................12

*City of Miami v. Bank of Am. Corp.*,
800 F.3d 1262 (11th Cir. 2015) ....................20

*Cohen v. Am. Sec. Ins. Co.*,
735 F.3d 601 (7th Cir. 2013) ....................7, 9, 17, 20

*Colman v. Wendover Funding, Inc.*,
89 F.3d 849 (10th Cir. 1996) ....................12

*Costa v. Kerzner Intern. Resorts, Inc.*,
2011 WL 2519244 (S.D. Fla. June 23, 2011) ....................20

*Dysart v. BankTrust*,
516 F. App'x 861 (11th Cir. 2013) ....................19

*Edwards v. Ocwen Loan Servicing, LLC*,
24 F. Supp. 3d 21, 28 (D.D.C. 2014) ....................6, 21

*EEOC v. Waffle House, Inc.*,
534 U.S. 279 (2002) ....................5

*Ernie Haire Ford, Inc. v. Ford Motor Co.*,
260 F.3d 1285 (11th Cir. 2001) ....................11

*Feaz v. Wells Fargo Bank, N.A.*,
745F.3d 1098, 1110-11 (11th Cir. 2014) ....................7, 8, 10, 20

*Feldkamp v. Long Bay Partners, LLC*,
773 F. Supp. 2d 1273 (M.D. Fla. 2011) ....................6

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
385 F.3d 159 (2d Cir. 2004) ....................18

*Gordon v Chase Home Fin., LLC*,
2013 WL 256743 (M.D. Fla. Jan. 23, 2013) ....................12, 14

*Gorush v. Fin. Freedom*,
2014 WL 4675453 (N.D. Ohio Sept. 18, 2014) ....................13

*Gustafson v. BAC Home Loans Servicing, LP*,
2012 WL 7051318 (C.D. Cal. Dec. 20, 2012) ....................16

*Gustafson v. BAC Home Loans Servicing, LP*,
2012 WL 7071488 (C.D. Cal. Dec. 26, 2012) ....................17

*Haddock v. Countrywide Bank, NA*,
2015 WL 9257316 (C.D. Cal. Oct. 27, 2015) ....................3, 4

*Hill v. Nationstar Mortg.*, LLC,
2015 WL 4478061, at *3 (S.D. Fla. July 6, 2015) ....................9

*Jackson v. BellSouth Telecomms.*,
372 F.3d 1250 (11th Cir. 2004) ....................19

*Kenty v. Bank One, Columbus, N.A.*,
92 F.3d 384 (6th Cir. 1996) ....................16

*Kolbe v. BAC Home Loans Servicing, LP*,
738 F.3d 432 (1st Cir. 2013)........8

*Kunzelmann v. Wells Fargo Bank, N.A.*,
2013 WL 139913 (S.D. Fla. Jan. 10, 2013)........18, 20

*LaCroix v. U.S. Bank, N.A.*,
2012 WL 2357602 (D. Minn. June 20, 2012 )........8

*Lane v. Wells Fargo Bank, N.A.*,
2013 WL 269133 (N.D. Cal. Jan. 24, 2013)........13

*Lass v. Bank of Am., N.A.*,
695 F.3d 129 (1st Cir. 2012) (Boudin, J., dissenting)........7, 8

*Licul v. Volkswagen Grp. of Am., Inc.*,
2013 WL 6328734 (S.D. Fla. Dec. 5, 2013)........19, 20

*Lockheed Martin Corp. v. Boeing Co.*,
357 F. Supp. 2d 1350 (M.D. Fla. 2005)........14

*Lyons v. Litton Loan Servicing LP*,
2016 WL 413104 (S.D.N.Y. Feb. 2, 2016)........3, 4, 5

*McKenzie v. U.S. Bank Home Mortg., Inc.*,
2012 WL 5372120 (N.D. Cal. Oct. 30, 2012)........8, 11, 13

*McKenzie v. Wells Fargo Bank, N.A.*,
931 F. Supp. 2d 1028 (N.D. Cal. 2013)........6

*Merkle v. Aetna Health Inc.*,
2005 WL 6151455 (S.D. Fla. April 27, 2005)........14, 15

*Merrill Lynch Bus. Fin. Servs., Inc. v. Performance Mach. Sys. U.S.A., Inc.*,
2005 WL 975773 (S.D. Fla. Mar. 4, 2005)........9

*Miller v. Wells Fargo Bank, N.A.*,
994 F. Supp. 2d 542 (S.D.N.Y. 2014)........5

*Millette v. DEK Technologies, Inc.*,
2008 WL 5054741 (S.D. Fla. Nov. 25, 2008)........18, 19

*Montoya v. PNC Bank, N.A.*,
2014 WL 4248208 (S.D. Fla. Aug. 27, 2014)........7, 14

*Morris v. Green Tree Servicing*,
LLC, 2015 WL 4113212 (D. Nev. July 8, 2015)........16

*Parrish v. Guar. Nat'l Ins. Co.*,
2006 WL 532241 (M.D. Fla. Mar. 3, 2006)........9

*Pierce v. State Farm Mut. Auto. Ins. Co.*,
2014 WL 7671718 (S.D. Fla. Dec. 17, 2014)........9

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
842 So. 2d 773 (Fla. 2003)........20

*QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*,
94 So. 3d 541 (Fla. 2012)....................10

*Rapp v. Green Tree Servicing, LLC*,
2013 WL 3992442 (D. Minn. Aug. 5, 2013)....................6

*Richardson v. Ameriquest Mortg. Co.*,
2011 WL 5548066 (Fla. Cir. Ct. Nov. 8, 2011)....................9

*Rothstein v. Balboa Ins. Co.*,
794 F.3d 256 (2d Cir. 2015)....................2, 3, 4, 5

*Roussin v. AARP, Inc.*,
664 F. Supp. 2d 412 (S.D.N.Y. 2009), *aff'd*, 379 F. App'x 30 (2d Cir. 2010)....................4

*Shibata v Lim*,
133 F. Supp. 2d 1311 (M.D. Fla. 2000)....................10, 11

*Sotomayor v. Deutche Bank Nat'l Trust Co.*,
Case No. 0:15-cv-61972, slip. op. (S.D. Fla. Feb. 5, 2016)....................9

*Stallworth v. Hartford Ins. Co.*,
2006 WL 2711597 (N.D. Fla. Sept. 19, 2006)....................10

*Taffet v. Southern Co.*,
967 F. 2d 1483 (11th Cir. 1992)....................2, 18

*Telfair v. First Union Mortg. Corp.*,
216 F.3d 1333 (11th Cir. 2000)....................9

*Trevathan v. Select Portfolio Servicing, Inc.*,
2015 WL 6913144 (S.D. Fla. Nov. 6, 2015)....................2, 4, 5

*Trunzo v. Citi Mortgage*,
876 F. Supp. 2d 521 (W.D. Penn. 2012)....................6

*U.S. v. Hasson*,
333 F.3d 1264 (11th Cir. 2003)....................14

*Uniforce Temp. Pers., Inc. v. Nat'l Council on Comp. Ins., Inc.*,
892 F. Supp. 1503 (S.D. Fla. 1995)....................3

*United States v. Turkette*,
452 U.S. 576 (1981)....................18

*Validsa, Inc. v. PDVSA Servs., Inc.*,
424 F. App'x 862 (11th Cir. 2011)....................20

*Wahl v. Am. Sec. Ins. Co.*,
2008 WL 2444802 (N.D. Cal. June. 16, 2008)....................8

*Wegoland Ltd. v. NYNEX Corp.*,
27 F.3d 17 (2d Cir. 1994)....................3

*Weinberger v. Mellon Mortg. Co.*,
1998 WL 599192 (E.D. Pa. Sept. 10, 1998)....................16

*Wilson v. Everbank, N.A.*,
2015 WL 1600549 (S.D. Fla. April 9, 2015) ....................17

*Wilson v. Everbank, N.A.*,
2015 WL 4043015 (S.D. Fla. May 6, 2015) ....................15, 16, 17

*Wilson v. Everbank, N.A.*,
77 F. Supp. 3d 1202, 1225 (S.D. Fla. 2015) .................... *passim*

**Statutes**

Fla. Stat. Ch. 627, Pt. I. ....................4

Fla. Stat. § 627.031(1)(a) ....................4

Fla. Stat. § 627.062(1)....................4

Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* ....................2

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d) ....................2

Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ....................2

**Other Authorities**

12 C.F.R. § 226....................12

12 C.F.R. § 226.4(d)(2)....................13

12 C.F.R. § 226.17(b) ....................13

12 C.F.R. § 226.17(c)....................12

12 C.F.R. § 226.20(a)....................14

44 C.F.R. § 62.6....................7

Truth in Lending; Official Staff Commentary, 1981 WL 122369 (Oct. 9, 1981) ....................14

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Specialized Loan Servicing LLC ("SLS") moves to dismiss the Class Action Complaint ("Complaint"), Dkt. No. 1, filed by plaintiffs Pankaj Patel and Laketha Wilson (collectively, "plaintiffs").

## PRELIMINARY STATEMENT

Plaintiffs bring suit because, they allege, SLS purchased lender placed hazard insurance ("LPI") with "hyper-inflated" premiums after plaintiffs failed to maintain coverage on their properties secured by mortgages serviced by SLS ("Mortgages") (Dkt. Nos. 1-2, 1-3). Plaintiffs acknowledge that their Mortgages "include a provision requiring the borrower to maintain hazard insurance coverage[.]" Compl. ¶ 25. They also concede that their Mortgages "permit the lender to obtain, force-placed coverage and charge the premiums to the borrower" in the event borrowers – plaintiffs here – fail to fulfill their contractual promise to maintain adequate and seamless coverage. *Id.* The Complaint quotes from these provisions, including language where plaintiffs "acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that [plaintiffs] could have obtained." *Id*. at ¶¶ 49, 62.

The Mortgages were not the only documents warning plaintiffs that LPI might be more expensive. Prior to placement of LPI, plaintiffs each received multiple letters regarding their coverage lapses, encouraging them to purchase their own coverage, and warning that SLS would purchase potentially more expensive LPI if they did not. For example, the first letter to Mr. Patel warned that "[b]ecause hazard insurance is required on your property, we plan to buy insurance for your property." Declaration of Ronald K. Wilson Regarding Plaintiff Pankaj Patel (Dkt. No. 22-1) ("Wilson Decl. (Patel)") at Ex. 1. The letter explained that "[t]he cost of the insurance we obtain is likely to be much higher than the cost of coverage you could obtain on your own . . .." In addition to several other disclosures, this letter also indicated that "[i]f we purchase insurance for you, an affiliate of SLS may benefit," potentially in the form of a "commission." The letter disclosed further that "[t]he insurance company may factor such commission into the rate charged for the coverage." The letter expressed a "**HOPE [THAT] YOU'LL AGREE THAT OBTAINING YOUR OWN INSURANCE IS IN YOUR BEST INTEREST**" and "**strongly recommend[ed] that [plaintiffs] obtain [their] own insurance**." *Id*. (emphasis in original). The policy ASIC ultimately issued contained even more disclosures and urged, "**Don't let this happen. Avoid lender-placed insurance.**" *Id*. at Ex. 3. (emphasis in original).

Despite these disclosures, plaintiffs seek to hold SLS liable for damages purportedly

incurred when SLS charged them for LPI that was more expensive than the coverage they allowed to lapse. Compl. ¶ 56. Plaintiffs contend that SLS and American Security Insurance Company ("ASIC") were involved in a fraudulent "scheme" to place LPI on unwitting borrowers, all so ASIC could pay "kickbacks" to SLS in the form of commissions, the provision of "below cost services," and the like. *See*, *e.g.*, Compl. ¶¶ 5, 26. Plaintiffs allege that SLS is liable for not disclosing "exclusive arrangements with ASIC and its affiliates, to manipulate the force-placed insurance market and artificially inflate the amounts they charge to borrowers for [LPI]," *id*. ¶ 26, and bring claims against SLS for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq.*; the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*; and for violation of and conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), (d).

The Court should dismiss the Complaint. The Complaint's centerpiece theory is that SLS received money derived from the LPI premium in the form of "kickbacks" from ASIC and that SLS did not subtract these "kickbacks" from plaintiffs' premium charge. The LPI premium, however, was determined using filed and approved rates. As another court in this district recently held in an identical LPI case, the claims plaintiffs advance are barred by Florida's filed-rate doctrine. *See Trevathan v. Select Portfolio Servicing, Inc.*, 2015 WL 6913144, at *1, 3 (S.D. Fla. Nov. 6, 2015) (dismissing LPI "kickback" claims under the filed rate doctrine). Also, as discussed in more detail below, plaintiffs fail to state any substantive claim against SLS.

## ARGUMENT

### I. THE FILED RATE DOCTRINE BARS ALL CLAIMS

The filed rate doctrine bars courts from addressing claims that directly or indirectly challenge filed and approved rates, or their components. *See*, *e.g.*, *Taffet v. Southern Co.*, 967 F. 2d 1483, 1490 (11th Cir. 1992). The Second Circuit recently dismissed an LPI case just like this one in *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256 (2d Cir. 2015), the first appellate decision squarely addressing the filed rate doctrine in the context of LPI. A trend has emerged in the wake of *Rothstein*. Subsequently, three district courts from districts, including this one, that had previously rejected (or inconsistently applied) the doctrine in LPI cases have now followed the Second Circuit's guidance and embraced the filed rate doctrine for these LPI claims. *See Trevathan*, 2015 WL 6913144, at *1, 3 (dismissing identical LPI "kickback" claims under the

filed rate doctrine); *Haddock v. Countrywide Bank, NA*, 2015 WL 9257316, at *18-19 (C.D. Cal. Oct. 27, 2015) (dismissing substantively identical claims under the filed rate doctrine); *Lyons v. Litton Loan Servicing LP*, 2016 WL 413104 (S.D.N.Y. Feb. 2, 2016). Thus, where once there was disagreement, there now is a developing consensus that the filed rate doctrine requires immediate dismissal of this case.

"Simply stated, the doctrine holds that any 'filed rate' — that is, one approved by the governing regulatory agency — is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994). The doctrine's rationale is twofold. First, it preserves a regulator's authority to determine the reasonableness of rates and prohibits courts from second-guessing that determination (*i.e.*, the "nonjusticiability principle"). *See Uniforce Temp. Pers., Inc. v. Nat'l Council on Comp. Ins., Inc.*, 892 F. Supp. 1503, 1512 (S.D. Fla. 1995). Second, it ensures that regulated entities charge only those rates that have been approved and thereby prevents discrimination among insureds (*i.e.*, the "nondiscrimination principle"). *See id.*

Many LPI plaintiffs have tried to avoid the filed rate doctrine by claiming to challenge the "kickback schemes" rather than the rates themselves. That is a semantic twist that ignores both the substance of plaintiffs' theory (that the rates were too high), and the consequence of plaintiffs' claims (that any relief provided would require judicial determination of a reasonable rate). The court in *Rothstein* squarely rejected this effort to avoid the doctrine, noting that "a claim may be barred even if it can be characterized as challenging something other than the rate itself." 794 F.3d at 262. The court concluded that "[p]lainly, Plaintiffs' claims would undermine the rate-making authority of the state insurance regulators who approved Balboa's rates. The theory behind the claims is that Plaintiffs were overbilled when they were charged the full LPI rates (which were approved by the regulators), instead of lower rates net of the value of the [kickbacks] provided by Newport." *Id.*

"Thus Plaintiffs' claims invite judicial meddling in issues of insurance policy" and therefore violate the nonjusticiability principle of the filed rate doctrine. *Id*. at 263. LPI suits also violate the nondiscrimination principle because "[a]ny damages recovered by these Plaintiffs would operate 'like a rebate . . . to give [them] a preference' over other borrowers who were charged for LPI." *Id.* at 263. And that "problem is not obviated simply because Plaintiffs have brought their claims on behalf of a putative class." *Id*. Following the Second Circuit's

lead, *Trevathan* similarly held that the purported distinction between the "kickbacks" and the rates themselves is "unavailing," and "agree[d] with the logic and conclusions" of *Rothstein*. 2015 WL 6913144, at *3 and n.3. And in *Lyons*, the court concluded that, regardless of plaintiffs' characterization, the claims "would require the Court to consider the reasonableness of the rates charged." 2016 WL 413104, *12. *See also Haddock*, 2015 WL 9257316, at *19.

Here, as in *Rothstein*, *Trevathan*, *Lyons*, *Haddock*, and others, there is no reasonable dispute that plaintiffs' claims implicate the rationales that animate the doctrine. They allege that the so-called kickbacks led to rates that were "artificially inflate[d]," "hyper-inflated," "illegitimate," and "noncompetitive." Compl. ¶¶ 26, 30, 38, 45, and 47. Nor is there dispute that ASIC, an insurance company licensed to operate in Florida, had filed its LPI rates with (and secured the approval of) the Florida Office of Insurance Regulation ("OIR"), the regulatory agency charged under Florida law with "regulating insurance rates . . . to the end that they shall not be excessive, inadequate, or unfairly discriminatory." Fla. Stat. §§ 627.031(1)(a), 627.062(1); *see generally* Fla. Stat. Ch. 627, Pt. I. Notably, with regard to property insurance, including LPI, the OIR "may not directly or indirectly . . . [p]rohibit any insurer . . . from paying acquisition costs . . . or prohibit any such insurer from including the full amount of acquisition costs in a rate filing." *Id.* § 627.062(2)(i). Under this statutory scheme, ASIC submitted its rate filings to the OIR, which reviewed and approved them, and calculated all of the premiums for plaintiffs' LPI policies based on these filed and approved rates. *See* Declaration of Rebecca H. Voyles (Dkt. No. 22-14) ("Voyles Decl.") ¶¶ 4-9; Declaration of Ronald K. Wilson Regarding Plaintiff Laketha Wilson (Dkt. No. 22-8) at ¶¶ 12-16; Wilson Decl. (Patel) at ¶¶ 13-20.

Because the OIR approved ASIC's LPI rates, under *Rothstein* and others, the filed rate doctrine prohibits plaintiffs from challenging those rates; components of those rates, including commissions or expense loads; or the resulting premiums. *See Trevathan*, 2015 WL 6913144, at *1, 3; *Roussin v. AARP, Inc.*, 664 F. Supp. 2d 412, 417 (S.D.N.Y. 2009), *aff'd*, 379 F. App'x 30 (2d Cir. 2010) (a challenge to components "that make up a portion of the premium," means Plaintiff "is challenging UHG's insurance premiums, albeit one particular element of the premiums, and thus her claims are barred by the filed rate doctrine."); *Lyons*, 2016 WL 413104, at *25 (plaintiffs' claims impermissibly required the court to decide "whether the alleged commissions, reinsurance, or expense reimbursements should have been reflected in the calculation of LPI."). Plaintiffs' central allegations are that they paid too much for LPI, despite

paying the filed rate. And as numerous courts recognize, any judicial inquiry into such allegations would violate the filed rate doctrine's twin principles of nonjusticiability and nondiscrimination. *Rothstein*, 794 F.3d at 261-64; *Trevathan*, 2015 WL 6913144, at *2.

This conclusion applies equally to claims against SLS. The filed rate doctrine is triggered not by suing a certain defendant, but by bringing *claims* that implicate *either* the nonjusticiability or nondiscrimination principle of the filed rate doctrine. *See Rothstein*, 794 F.3d at 263-64 (describing the nondiscrimination principle as an "independently sufficient" reason for dismissal). For that reason, numerous courts have expressly held that the filed rate doctrine extends to parties other than the actual rate filer. *See, e.g.*, *Trevathan*, 2015 WL 6913144, at *3 ("extend[ing] *Rothstein*'s reasoning to the servicer" and dismissing all LPI "kickback" claims against all defendants); *Lyons*, 2016 WL 413104, at *21 (dismissing claims against servicers because the filed rate doctrine applies "regardless of who is ultimately responsible for setting the amount charged to borrowers . . . ."); *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 554 (S.D.N.Y. 2014) (explaining that the doctrine is "no less implicated when a plaintiff brings claims against an entity like [a mortgage servicer], which acquired policies with premiums based on [the LPI insurer's] filed rate, than when claims are asserted against the rate-filing entity itself"); *see also Rothstein*, 794 F.3d at 264 ("The filed rate doctrine is not limited to transactions in which the ratepayer deals directly with the rate filer. The doctrine operates notwithstanding an intermediary that passes along the rate."). The court in *Trevathan* explained further that permitting claims against servicers which pass along the exact rate insurers are required to charge "would contravene the purposes of the filed rate doctrine." 2015 WL 6913144, at *3.

If this Court ordered a refund of a portion of premiums, it would undermine the OIR's rate discretion *and* cause these plaintiffs to pay rates lower than others. That outcome would offend both principles of the filed rate doctrine, either of which warrants immediate dismissal.

## II. PLAINTIFFS HAVE NOT ADEQUATELY PLED A CLAIM FOR BREACH OF CONTRACT

### A. SLS Is Not A Party To the Contract

"It goes without saying that a contract cannot bind a nonparty." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). Plaintiffs allege that SLS breached paragraphs 5 and 9 of their Mortgages. *See* Compl. ¶¶ 61-62, and 87. The plain language of those sections, however, refers to the rights and obligations only of the "Lender," which the Patel and Wilson instruments

elsewhere define as IndyMac Bank, F.S.B. and Countrywide Home Loans, Inc., respectively. The Complaint alleges merely that "SLS is a third-party loan servicer," Compl. ¶ 1, and a "mortgage servicer and collections entity." Compl. ¶ 18. The Mortgages similarly distinguish between a "Lender" and "Loan Servicer," the latter of which they define as "the entity that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Agreement, and Applicable Law." Mortgages at ¶ 20. In short, SLS is not a party to either Mortgage and is not otherwise defined as the "Lender," which is the only party (other than the borrowers) who could breach. Though SLS is the servicer, it does so as an agent on behalf of the loans' owners. In that capacity it cannot breach a contract to which it is not a party and pursuant to which it made no promises and received no consideration. *Babul v. Golden Fuel, Inc.*, 990 So. 2d 680, 683 (Fla. Dist. Ct. App. 2008) ("[A]n agent acting within the course and scope of its agency relationship with a disclosed principal is not liable for the debts and obligations of the principal[.]").

Florida law requires a plaintiff to allege plausibly that a contract exists. *See Feldkamp v. Long Bay Partners, LLC*, 773 F. Supp. 2d 1273, 1279 (M.D. Fla. 2011). While plaintiffs have valid contracts here, they are not with SLS. On nearly identical facts, the court in *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025 (N.D. Cal. 2013), dismissed a breach of contract claim against a servicer. Applying Florida law, and raising the issue *sua sponte*, the court concluded that "a breach-of-contract claim cannot be maintained against [the servicer] as it was not a contracting party." *Id.* at 1052. Similarly, in *McKenzie v. Wells Fargo Bank, N.A.*, 931 F. Supp. 2d 1028 (N.D. Cal. 2013) another LPI case with nearly identical facts, the court reaffirmed analysis from a prior order concluding that that the servicer "could not be sued for breach of contract since it was not a party to the contract." *Id.* at 1036; *see also Trunzo v. Citi Mortgage*, 876 F. Supp. 2d 521, 533 (W.D. Penn. 2012) ("As a 'servicer' only receives limited rights and obligations under the mortgage contract relating to servicing, it is not a party to the original debt instrument like a 'lender' or 'note holder,' and, therefore, cannot be held liable for breaches in obligations that remain held by the 'lender' or 'note holder.'"); *Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 28 (D.D.C. 2014) (similar); *Rapp v. Green Tree Servicing*,

*LLC*, 2013 WL 3992442, at *7 (D. Minn. Aug. 5, 2013) (similar).[1] In short, because SLS is not a party to the Mortgages, plaintiffs cannot plausibly plead that SLS is liable for breach of the same.

**B. Plaintiffs Have Not Pled A Viable Breach By SLS**

Plaintiffs allege two breaches by SLS, neither of which is cognizable. They first allege that SLS breached by "charging Plaintiffs and the Class members amounts beyond the actual cost of coverage." Compl. ¶ 90. But the Mortgages nowhere promise that servicer will charge plaintiffs no more than the provider's net cost. *Anapoell v. Am. Express Bus. Fin. Corp.*, 2009 WL 766532, at *4 (10th Cir. Mar. 24, 2009) (affirming dismissal of breach of contract claim alleging damages for price beyond actual cost). Because no such provision exists, plaintiffs cannot plausibly allege a breach on this basis. As this district held in an analogous LPI case, the "problem for Plaintiff[s' breach of contract claim] . . . is that their agreements do not say that [the lender or servicer] cannot charge them these extra costs." *Montoya v. PNC Bank, N.A.*, 2014 WL 4248208, at *10 (S.D. Fla. Aug. 27, 2014). Nor would such a limitation make sense, given that commissions and other fees are a normal component of insurance's cost. *Lass v. Bank of Am., N.A.*, 695 F.3d 129, 144 (1st Cir. 2012) (Boudin, J., dissenting) ("Placing insurance in exchange for commissions is what independent agents do all the time, and the bank can hardly place insurance without incurring costs of its own."); *see also Feaz v. Wells Fargo Bank, N.A.*, 745F.3d 1098, 1110-11 (11th Cir. 2014) ("We agree with the Seventh Circuit that 'simply calling a commission a kickback doesn't make it one.") (quoting *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 611 (7th Cir. 2013).[2] Finally, the underlying premise of plaintiffs' argument is easily

---

[1] *Burdick v. Bank of Am., N.A.*, 99 F. Supp. 3d 1372 (S.D. Fla. 2015) does not counsel a different result. The treatment of this issue was brief, outside of the breach of contract context, dicta, and it did not consider the above-cited authorities, some of which apply Florida law.

[2] Plaintiffs also allege that the commission payments are improper and constitute "kickbacks" because SLS's affiliate "performs no actual services and solely serves as a vehicle to obtain kickbacks." Comp. ¶ 147. However, an agent or affiliate of the servicer initiates, negotiates, and procures the group master policy under which individual certificates are issued. The SLS-licensed agency affiliate earns commissions for procuring the group master policy and performing these other services. That agency earns commissions pursuant to an agency agreement following the payment by SLS of premium on individual certificates of insurance issued under a group master policy arrangement. As the procuring agent, the SLS agency affiliate fully earns commission payments when the LPI premiums are paid to ASIC. *See, e.g.*, 4 Couch on Ins. § 57:11 (a selling agent is entitled to compensation "if his or her agency is the procuring cause of the sale"); 44 C.F.R. § 62.6 (commission payments under National Flood Insurance Program paid to agent that "duly procures" the insurance). Nor do the allegations

reduced to absurdity. If the mere act of charging above one's actual cost was actionable, then any business transaction where one party makes a profit would trigger liability. Yet, that is the only "fact" that plaintiffs allege in support of this first of the two purported breaches.

Nor did SLS breach the contract by placing "excess" or "unnecessary" coverage, which is the second alleged breach. Compl. ¶ 90. It is well-settled that a lender's interest in a property is not limited to the loan balance. *Feaz*, 745 F.3d at 1106-1110; *Cannon v. Wells Fargo Bank, N.A.*, 917 F. Supp. 2d 1025, 1041 (N.D. Cal. 2013) (citing *McKenzie v. U.S. Bank Home Mortg., Inc.*, 2012 WL 5372120, at *18 (N.D. Cal. Oct. 30, 2012), and *Lass v. Bank of Am., N.A.*, 695 F.3d 129, 143 (1st Cir. 2012) (Boudin, J., dissenting)). *See also, e.g.*, *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 444 (1st Cir. 2013) ("agree[ing] with the contract interpretation offered by Judge Boudin" in *Lass*, and "adopt[ing] and incorporate[ing] Judge Boudin's reasoning" in affirming the district court's dismissal of the excessive flood coverage claim); *LaCroix v. U.S. Bank, N.A.*, 2012 WL 2357602, at *4 (D. Minn. June 20, 2012 ) (finding "no conflict or ambiguity" and that "the plain meaning of the hazard provision provides [the servicer] discretion to set the applicable amount of flood insurance"). Because numerous courts, including the Eleventh Circuit, have now held that lenders have the contractual right to place coverage in excess of the loan balance, actually doing so cannot be a breach of contract.

Second, ostensibly in support of the alleged "unnecessary" insurance breach, the Complaint contends that SLS "disregard[ed] . . . the Lender's Loss Payable Endorsement ('LLPE') in the standard form mortgage agreement." Compl. ¶ 43.[3] But the *Mortgages* could not contain such endorsements, which, by definition, are appended to and modify *insurance policies*. Plaintiffs do not allege that their policies had LLPEs. Even if they had, the Mortgages

---

regarding quota-share reinsurance or below cost services state a plausible claim. *See, e.g.*, Compl. ¶¶ 27, 41. Such items, to the extent they exist, would be entirely rate-neutral to borrowers/policyholders; *i.e.*, borrowers/policyholders pay none of these items in paying LPI approved rates because there are no associated costs included in those rates.

[3] An LLPE is a side insurance contract for the benefit of the lender, not the borrower. "[A]n LLPE serves to ensure that if a homeowner's insurance policy is cancelled for failure to pay premiums, the *lender's* interest in the property will continue to be insured for a period of time, to permit the lender either to make the premium payments itself, or to arrange for alternate coverage. Thus, for a specified period after cancellation for non-payment, the lender is entitled to indemnification for any loss, even though the homeowner would have no claim against the insurer." *Wahl v. Am. Sec. Ins. Co.*, 2008 WL 2444802, at *1 (N.D. Cal. June. 16, 2008) (emphasis in original).

expressly vest the lender with the discretion to cancel an LLPE in favor of LPI. *Id.* ¶ 5 ("Lender is under no obligation to purchase any particular type or amount of coverage."). In practice, lenders routinely choose LPI over LLPE because LLPE policy limits exhaust upon payment of the loan's balance and therefore may not cover a property's replacement cost.

**C. Plaintiffs Did Not Perform Under The Mortgages**

The Complaint does not allege that Plaintiffs performed their obligations under the Mortgages before filing the instant suit. *See, e.g., Merrill Lynch Bus. Fin. Servs., Inc. v. Performance Mach. Sys. U.S.A., Inc.*, 2005 WL 975773, at *5 (S.D. Fla. Mar. 4, 2005) (dismissing breach of contract claim where plaintiff failed to plead that it "sufficiently performed its contractual obligations"). Plaintiffs allege that SLS's actions breached the contract. But as another court in this District held, before borrowers can bring suit alleging a breach of "any provision of, or any duty owned by reason of the mortgage," they first must provide notice to their lender/servicer and allow that entity an opportunity to cure. *See Hill v. Nationstar Mortg.*, LLC, 2015 WL 4478061, at *3 (S.D. Fla. July 6, 2015).[4] Plaintiffs make no allegations that they satisfied this condition precedent to suit and, as a result, their *entire case* — not just the breach of contract claim — should be dismissed. *See id.* (dismissing the complaint "regardless of the causes of action alleged."); *see also Sotomayor v. Deutche Bank Nat'l Trust Co.*, Case No. 0:15-cv-61972, slip. op. (S.D. Fla. Feb. 5, 2016) (attached as Exhibit A).

Plaintiffs also concede that they breached their contractual obligations to maintain continuous insurance. *See* Compl. ¶¶ 50, 63. Courts have dismissed claims similar to plaintiffs' when, as here, the borrower's own breach is the cause of LPI being issued for their property. *See Richardson v. Ameriquest Mortg. Co.*, 2011 WL 5548066 (Fla. Cir. Ct. Nov. 8, 2011) (plaintiff's "initial breach resulted in the lender-placement, so he cannot complain about the cost"); *Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1341 n.15 (11th Cir. 2000) (similar); *Parrish v. Guar. Nat'l Ins. Co.*, 2006 WL 532241, at *2 (M.D. Fla. Mar. 3, 2006) (similar); *Cohen*, 735 F.3d at 604 (similar). Thus, plaintiffs failure to fulfill their own acknowledged mortgage obligation precludes them from bringing claims for breaches of those agreements.

---

[4] Paragraph 20 of both Mortgages is plain in this regard: borrower cannot "commence . . . any judicial action . . . that arises . . . pursuant to this Security Instrument . . .until such Borrower . . . has notified the other party . . . of such alleged breach and afforded . . . a reasonable opportunity after giving such notice to take corrective action."

## III. PLAINTIFFS HAVE NOT ADEQUATELY PLED A CLAIM FOR BREACH OF THE IMPLIED COVENANT

"To allege a breach of the implied covenant, the party must demonstrate a failure or refusal to discharge contractual responsibilities . . . by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Shibata v Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000). Among others, there are two significant limitations on an implied covenant claim under Florida law: "(1) where application of the covenant would contravene the express terms of the agreement; and (2) where there is no accompanying action for breach of an express term of the agreement." *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 548 (Fla. 2012). Plaintiffs fail to meet these standards.

First, as discussed above, plaintiffs have failed to state a claim for breach of contract for any number of reasons. In *Feaz,* the Eleventh Circuit affirmed dismissal of such a claim on nearly identical facts, concluding that "[a] bank does not act in bad faith when acting to protect its legitimate interests through contractually authorized actions." 745 F.3d at 1110. In other words, breach of the implied covenant is wholly derivative of an accompanying breach of contract, without which the implied covenant claim necessarily fails. *See Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005) (A "breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation" to protect the parties' reasonable expectations). Moreover, as shown above, SLS is not party to the contracts, which means that it cannot be liable for breaching the covenant implied in those agreements. *See Bruggermann v. Amacore Grp., Inc.*, 2010 WL 2696230, at *6 (M.D. Fla. July 6, 2010) (dismissing implied covenant claim against defendants "because they were not a party to the Merger Agreement"); *Stallworth v. Hartford Ins. Co.*, 2006 WL 2711597, at *7 (N.D. Fla. Sept. 19, 2006) (holding that defendant was not "liable under either a breach of contract claim or a claim for breach of the implied covenant of good faith and fair dealing because he was not a party to the insurance contract.").

Second, even if plaintiffs plausibly alleged a contract with SLS, their claim still fails because "Florida appellate courts have . . . held that '[t]he implied covenant of good faith cannot be used to vary the terms'" of such contract. *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316 (11th Cir. 1999). Here, both Mortgages make clear that "Lender is under no obligation to purchase any particular type or amount of coverage" and that "Borrower acknowledges that the

cost of the insurance so obtained might significantly exceed the cost of insurance that Borrower could have obtained." Compl. ¶ 49. And the Mortgages impose no duties on SLS, as Lender's agent, to shop for the least expensive coverage, employ a specific methodology to identify and remedy insurance lapses, forego receipt of lawful commissions to affiliates, or perform this contractual term in any other specific way. Plaintiffs cannot possibly show that SLS's conduct somehow "depriv[ed] them of the benefits of the agreement" or "disappoint[ed] the[ir] reasonable expectations." *Shibata*, 133 F. Supp. 2d at 1319. As the Eleventh Circuit explained, "right and duty are different sides of the same coin," *Weaver*, 169 F. 3d at 1317; the Mortgages gave plaintiffs no rights regarding these aspects of LPI, and so SLS has no consequential contractual duties. In this way, plaintiffs' breach of the implied covenant claim impermissibly seeks to alter and add terms to the Mortgages. *Weaver* requires dismissal of this claim.

Third, the Complaint fails to allege that SLS exercised its discretion unreasonably. A contracting party's exercise of discretion bestowed by the agreement "will not violate the implied covenant of good faith and fair dealing '*unless no reasonable party . . . would have made the same discretionary decision.*'" *Burger King Corp. v. Ashland Equities, Inc.*, 217 F. Supp. 2d 1266, 1278-79 (S.D. Fla. 2002) (emphasis added) (quoting *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001); *see also McKenzie*, 2012 WL 5372120, at *20 (dismissing unjust enrichment claim in similar LPI case because plaintiffs had not shown that the defendants had unreasonably exercised their discretion). Here, plaintiffs do not allege that "no reasonable party . . . would have made the same discretionary decision." Plaintiffs instead allege that several other lenders or servicers made the same decisions on a nationwide basis. Compl. ¶¶ 8-14. Moreover, the Complaint fails to allege the existence, availability, or attributes (including price and coverage) of alternative LPI coverage available in the marketplace to SLS. Plaintiffs thus imply that SLS's choice was unreasonable without alleging the existence of other plausible, less costly alternatives. Plaintiffs' conclusory allegations, lacking any supporting factual context, are insufficient to meet modern pleading standards. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 US 662, 678 (2009).

In fact, the Complaint and incorporated notices demonstrate that SLS fulfilled its obligations and exercised its discretion reasonably. SLS gave plaintiffs notice and time to obtain their own insurance, placed insurance at an objectively reasonable amount approved by state regulators, repeatedly encouraged plaintiffs to obtain their own coverage to avoid "much higher"

LPI premiums, and informed plaintiffs that its agency affiliate "may benefit" from placement of LPI. Finally, SLS did not abuse its discretion by choosing a business relationship with ASIC, as the Mortgages contain no limitations on the insurers with which SLS can contract.

## IV. PLAINTIFFS HAVE NOT PLED A TILA CLAIM

TILA requires "creditors" to provide borrowers with specified disclosures about loan terms. *See Chastain v. N.S.S. Acquisition Corp.*, 2009 WL 1971621, at *3 (S.D. Fla. July 8, 2009). "Regulation Z," 12 C.F.R. § 226, implements TILA's disclosure requirements and outlines the timing and content of required disclosures. *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1372 (S.D. Fla. 2009). Plaintiffs allege that SLS violated 12 C.F.R. § 226.17(c) by not making disclosures when it (i) added LPI charges to plaintiffs' mortgage balances, Compl. ¶ 126; (ii) charged for "unauthorized kickbacks" in LPI premiums without properly disclosing their "amount and nature," *id.* ¶¶ 126-27; and (iii) issued more LPI "than necessary to protect its interest in the propert[ies]," *id.* ¶ 129. Plaintiffs' TILA claim fails for a number of reasons.

First, 12 C.F.R. § 226.17(c) applies only to "creditors." Title 15, Section 1602(g) defines "creditor" to mean "***only*** . . . a person who ***both*** (1) regularly extends . . . consumer credit . . . and (2) is the person to whom the debt arising from the consumer credit transaction is ***initially*** payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement" (emphasis added). Plaintiffs do not – and cannot – allege facts sufficient to show that SLS is a creditor. The Mortgages attached to their Complaint show that IndyMac Bank, F.S.B. and Countrywide Home Loans, Inc. are the "persons" to whom the debts were initially payable on the face of the instruments. Moreover, though the TILA claim conclusorily alleges that SLS "owned Plaintiffs' mortgages," it alleges no accompanying facts to show the plausibility of that contention. This is squarely at odds with the concession that SLS is merely a "third-party loan servicer," Compl. ¶ 1, and a "mortgage servicer and collections entity," *id.* ¶ 18, that does not regularly extend consumer credit. Because SLS is not a "creditor," TILA does not apply to it. *See Colman v. Wendover Funding, Inc.*, 89 F.3d 849 (10th Cir. 1996) (Table) (affirming summary judgement against plaintiff because he "failed to produce sufficient evidence to demonstrate that [defendant] is a creditor under TILA.").

Second, plaintiffs are incorrect that the LPI premiums "changed the finance charge" of the Mortgages, thus triggering new disclosure requirements. Compl. ¶ 127. "[T]he disclosure provisions of TILA do not apply to 'premiums for insurance against loss or damage to property'

when the 'insurance coverage may be obtained from a person of the consumer's choice, and this fact is disclosed.'" *Gordon v Chase Home Fin., LLC*, 2013 WL 256743, at *8 (M.D. Fla. Jan. 23, 2013) (quoting 12 C.F.R. § 226.4(d)(2)). Plaintiffs do not dispute that they could have, and since have, obtained voluntary coverage. In fact, the cycle letters expressly urged them to do just that. Nor is there any reasonable dispute that LPI premiums are "for insurance against loss or damage to property." As another court reasoned when concluding that TILA did not apply to LPI transactions, "[h]elping consumers make informed choices by giving them the information needed to 'compare more readily the various credit terms available' is TILA's raison d'être. [GMAC] did just that — it disclosed to [plaintiff] the information she would need to make an informed choice about hazard insurance. [The cycle letter] sent by [GMAC] could hardly have made this plainer." *Adams v. GMAC Mortg. Corp. of Pa.*, 1994 WL 702639, at *5 (N.D. Ill. Dec. 14, 1994) (internal citations omitted). On that basis, the court in *Adams* concluded that LPI premiums were not finance charges requiring disclosures under TILA. *Id. See also Gorush v. Fin. Freedom*, 2014 WL 4675453, at *4 (N.D. Ohio Sept. 18, 2014) (dismissing TILA claim because the servicers "informed [plaintiff] that she could obtain . . . insurance through a provider of her choosing or through her lender (*i.e.*, by way of [LPI]), and because [the servicers] accurately disclosed to [plaintiff] the premium amount and term for [LPI] obtained on her behalf"); *Lane v. Wells Fargo Bank, N.A.*, 2013 WL 269133, at *15 (N.D. Cal. Jan. 24, 2013).

Third, the issuance of LPI did not alter plaintiffs' Mortgages, the express terms of which provide that SLS can place insurance at plaintiffs' expense if they fail to maintain coverage and add the cost to plaintiffs' principal loan balance. *See* Mortgages ¶ 5 ("Mortgagee may . . . expend . . . any sums which may be necessary to purchase the required hazard or flood insurance, which shall be fully secured by this Mortgage and which shall accrue interests from the time expended until paid at the rate set forth in the Note(s)."); *see also McKenzie*, 2012 WL 5372120, at *24 (dismissing similar TILA claim because the mortgage's original terms expressly "provided Defendants the authority to require coverage beyond the principal loan balance"); *Lane*, 2013 WL 269133, at *15 (dismissing TILA claim in LPI case because "Wells Fargo did not alter the terms of plaintiffs' loan by purchasing insurance in an amount provided for by the parties' agreement."). Thus, plaintiffs have not plausibly alleged alteration to the Mortgages' terms as a trigger for disclosure obligations under TILA.

Finally, any disclosure obligations required by TILA ended at consummation of

plaintiffs' loans. *See* 12 C.F.R. § 226.17(b) ("The creditor shall make disclosures before consummation of the transaction."); *Arnett v. Bank of Am., N.A.*, 874 F. Supp. 2d 1021, 1038(D. Or. 2012) ("[E]xcept in certain circumstances . . . TILA requires the creditor to make disclosures *before* the credit is extended."). TILA requires post-consummation disclosures only "when an existing obligation . . . is satisfied and replaced by a new obligation undertaken by the same consumer." 12 C.F.R. § 226.20(a). Here, plaintiffs' existing obligations under the Mortgages were not satisfied, and plaintiffs do not allege otherwise. Moreover, "new disclosures are not required when the new obligation is attributable to the borrower's failure to fulfill a prior commitment to maintain insurance on the property and the lender provides insurance coverage at the borrower's expense." *Gordon v. Chase Home Fin., LLC*, 2013 WL 256743, at *8 (M.D. Fla. Jan. 23, 2013). This rule derives from the Federal Reserve Board's Official Commentary on TILA, which states that because LPI is "written because of the consumer's default (for example, by failing to obtain or maintain required property insurance)," such coverage does not constitute a "finance charge" that requires disclosure. Truth in Lending; Official Staff Commentary, 1981 WL 122369, at *50299 (Oct. 9, 1981); *see also Montoya*, 2014 WL 4248208, at *16. Here, SLS purchased LPI only after plaintiffs' consummated their Mortgages and as a result of plaintiffs' failure to maintain their own coverage, making TILA irrelevant to the alleged LPI charges.

## V. PLAINTIFFS HAVE NOT PLED A RICO CLAIM

### A. Plaintiffs Have Not Successfully Alleged Mail And Wire Fraud

Plaintiffs' theory is that the content of the cycle letters amounts to mail and wire fraud. "Because Plaintiffs' RICO claims are predicated on allegations of fraud, their allegations must satisfy the heightened pleading requirement of Fed. R. Civ. P. 9(b)[.]" *Wilson v. Everbank, N.A.*, 77 F. Supp. 3d 1202, 1225 (S.D. Fla. 2015) ("*Wilson I*"). "[I]n the Eleventh Circuit '[a] scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts reasonably calculated to deceive persons of ordinary prudence." *Id*. at 1225 (quoting *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1372 (M.D. Fla. 2005) (quoting *U.S. v. Hasson*, 333 F.3d 1264, 1270-71 (11th Cir. 2003))).

As this Court held in another matter, "to constitute mail or wire fraud, the acts must contain some deception and intent to deceive." *Merkle v. Aetna Health Inc.*, 2005 WL 6151455, at *3 (S.D. Fla. April 27, 2005). In *Merkle*, the Court found that, because "the amount stated on the [letters] was the amount paid," such letters "contain[ed] accurate information" and there was

no deception, even where price calculations went undisclosed in those same notices. *Id*. at *3-4. Similarly, *Wilson I* dismissed RICO claims in a nearly identical LPI case because the alleged omissions or misrepresentations were immaterial to plaintiffs' decisions to forego coverage:

> Plaintiffs have not pleaded with particularity how Defendants' conduct regarding the misrepresented or concealed kickback charges were material to Plaintiffs' decisions not to procure the voluntary insurance coverage required under their mortgage agreements but, instead, to default under their agreements and concede to EverBank's forcibly placed insurance coverage and the ensuing charges. Neither have they stated with particularity how EverBank's communications were reasonably calculated to deceive its borrowers in making their decisions not to obtain coverage and to pay the amounts charged by EverBank as force-placed insurance costs.

77 F. Supp. 3d at 1226.

The Complaint here fails for the same reasons. Plaintiffs have not stated with particularity how the alleged misrepresentations and omissions in the LPI communications were material and reasonably calculated to deceive. Plaintiffs allege as the "scheme" that defendants "knowingly and intentionally falsely stated that the amounts for force-placed insurance that Plaintiffs were charged represented the actual 'cost' of the policies, when in fact such amounts also included kickbacks and other costs paid as bribes to SLS." Compl. ¶ 143. But that allegation is belied by the letters' clear disclosure that "**[i]f we purchase insurance for you, an affiliate of SLS may benefit**." Wilson Decl. (Patel) at Ex. 1 (emphasis added). Though plaintiffs pejoratively mischaracterize commissions as "kickbacks" and "bribes," there is no reasonable way to read this language without understanding that a portion of the premium may financially benefit an SLS affiliate. Labels aside, the Complaint's allegation that the letters misled readers to believe that the premium excluded commissions is implausible when those very same letters indicated otherwise.

An inspection of the letters uncovers nothing else that could form the predicate for the alleged pattern of racketeering and scheme to defraud. To the contrary, the letters are replete with additional warnings, disclosures, and recommendations to plaintiffs, including:

- that their voluntary coverage had lapsed;
- that, if they did not replace their insurance, SLS would place a policy, which could cost substantially more;
- that a related entity may receive a commission of the premium charged;
- the price of coverage;

- that they should not "let this happen" and should "[a]void [LPI]."
- "hop[ing that plaintiffs would] agree that obtaining your own insurance is in your best interest;" and
- "Strongly recommend[ing] that [plaintiffs] obtain [their] own coverage."

*See, e.g.*, Wilson Decl. (Patel) Exs. 1-3.

Under these circumstances, no "reasonably prudent" person could have been deceived. As the *Wilson I* Court elaborated:

> [Plaintiffs] admit that Defendants warned and disclosed to Plaintiffs that their voluntary coverage lapsed and when it lapsed; that they had an obligation to maintain coverage; that if they did not maintain coverage on their own, [their lender] would obtain a policy on their property; that the force-placed policy would cost substantially more; that the force-placed policy would inure to [their lender's] benefit; and that the increased amount would be charged by [their lender] to Plaintiffs. 'The Court cannot see how letters that warn of an imminent bad deal and urge one to seek better could possibly be calculated to deceive anyone.'

77 F. Supp. 3d at 1226-27 (quoting *Weinberger v. Mellon Mortg. Co.*, 1998 WL 599192, at *5 (E.D. Pa. Sept. 10, 1998)). Other LPI cases have reached similar conclusions. *See Wilson v. Everbank, N.A.*, 2015 WL 4043015, at *1 (S.D. Fla. May 6, 2015) ("*Wilson III*") (dismissing RICO claims against Everbank for the same reasons supporting dismissal against ASIC); *Morris v. Green Tree Servicing*, LLC, 2015 WL 4113212, at *12 (D. Nev. July 8, 2015) (dismissing a RICO claim in an LPI case because the cycle letters could not deceive a reasonably prudent person); *Gustafson v. BAC Home Loans Servicing, LP*, 2012 WL 7051318, at *7 (C.D. Cal. Dec. 20, 2012) ("the Court fails to see how Defendants' failure to inform Plaintiffs and class members that force-placed insurance practices also generated profits for Defendants is a material omission 'reasonably calculated to deceive' Plaintiffs"); *Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 390–91 (6th Cir. 1996) (alleged "kickbacks" for automobile LPI policies, where lender disclosed that borrowers would be charged for LPI, could not support a civil RICO fraud claim). Plaintiffs have not plausibly alleged that the cycle letters omitted facts as part of a scheme reasonably calculated to deceive a reasonable person. Thus, their RICO claim should be dismissed.

**B. Plaintiffs Have Not An Pled Proximate Causation**

While direct first-party reliance is not an element of a civil RICO claim, "Plaintiffs must assert that defendants' alleged racketeering activity ***proximately caused*** their injuries." *Wilson I*, 77 F. Supp. 3d at 1225 (emphasis added); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639,

654, 658 (2008). As a practical matter, this means that plaintiffs must show that *someone* "relied on defendants' misrepresentations." *Id*.

The *Wilson* court found no link between the alleged injury and purported mail fraud, noting that plaintiffs' alleged injury was the supposed *overcharge itself*, not any supposed failure to disclose the alleged "kickbacks." Defendants' urging of plaintiffs to comply with their obligations and avoid LPI, the court concluded, could not have caused that injury:

> [Lender's] alleged scheme consisted of urging Plaintiffs to adhere to their obligations and to obtain coverage or risk being charged significantly more for less coverage—and then, allegedly, including as some fraction of the charge for that coverage unearned commissions masked as authorized costs. Taking the allegations as true, it is simply not plausible that Plaintiffs' injuries in paying for the unauthorized charges were proximately caused by Defendants' allegedly improper scheme.

*Wilson I*, 77 F. Supp. 3d at 1227 (citing *Gustafson v. BAC Home Loans Servicing, LP*, 2012 WL 7071488, at *7 (C.D. Cal. Dec. 26, 2012)). Judge Bloom went on to add:

> Plaintiffs have not even alleged with the requisite plausibility that, but for [lender's] allegedly fraudulent conduct regarding the force-placed insurance charges—which added only a fraction to the insurance charges that Plaintiffs readily admit would have in any event been significantly more expensive than market-available coverage—Plaintiffs would not have paid the full force-placed insurance charges but, rather, would have opted either to now get their own insurance (as they were required but failed to do in the first place and after repeated admonition to do so) or contest the fractional, unauthorized charge.

*Id*. (citation omitted).

Causation is similarly lacking here. Plaintiffs do not even allege that they or anyone else ever *read* the letters, let alone plead facts showing how those letters proximately caused their injuries. *Wilson v. Everbank, N.A.*, 2015 WL 1600549, at *6 (S.D. Fla. April 9, 2015) ("*Wilson II*"). The Complaint instead alleges only that the letters "were sent." Compl., *e.g.*, ¶ 143. But even if plaintiffs had read them, as the court explained in *Wilson I*, it is not plausible to conclude that such letters caused the alleged injury. And had plaintiffs read the letters, the only reasonably foreseeable effect would have been plaintiffs' purchase of their own insurance coverage to avoid the alleged harm. Accordingly, plaintiffs have failed to plead proximate causation of injury. *See Cohen*, 735 F.3d at 614 ("The common premise underlying these allegations is that if [plaintiff] had known of the supposed kickbacks, she would not have paid the premiums for the lender-placed insurance . . . Her theory of damages seems to be that had she known the charges were really kickbacks, she would have breached her contractual duty to pay. That is senseless.").

And though plaintiffs allege that they "would not have paid, or would have contested these specific charges had Defendants disclosed that the illegal bribes and kickbacks were included," Compl. ¶ 146, that allegation is implausible. As shown above, the letters specified that an SLS affiliate would earn a financial benefit if SLS purchased LPI. Thus, plaintiffs had all of the information they needed to avoid paying premium with a commission component if that fact was as material as plaintiffs claim. Moreover, the letters repeatedly urged plaintiffs to purchase their own coverage and warned unequivocally that LPI would be more expensive. *See Wilson I*, 77 F. Supp. 3d at 1226-27 (rejecting on causation grounds an identical argument that plaintiffs would not have acquiesced to LPI if the cycle letters had disclosed the "kickbacks"). Moreover, commissions were expense components of the fully disclosed and approved rates, *Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 WL 139913, at *2 (S.D. Fla. Jan. 10, 2013), and the Eleventh Circuit has squarely held that plaintiffs have suffered "no legally cognizable injury by virtue of paying the filed rate." *Taffett v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992). There is no causal link between the letters and plaintiffs' alleged harm.

**C. Plaintiffs Have Not Pled A Viable "Enterprise"**

"The existence of an enterprise at all times remains a separate element which must be proved by the [plaintiff]." *United States v. Turkette*, 452 U.S. 576, 583 (1981). As this Court previously held, "[a] RICO enterprise can not be a group simply conspiring to commit a fraud, that is not enough to trigger the Act." *Millette v. DEK Technologies, Inc.*, 2008 WL 5054741, at *4 (S.D. Fla. Nov. 25, 2008). The Court added that, "when the complaint is founded on commercial relationships between the alleged components of the enterprise, the Plaintiff should 'plead facts dispelling the notion that the different parties entered into the alleged agreements for their own gain or benefit.'" *Id.* (citations omitted). "The enterprise must be separate from the pattern of racketeering . . . and distinct from the person conducting the affairs of the enterprise." *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161-62 (2001)).

Without alleging any supporting facts, plaintiffs declare that "[a]t all relevant times, Defendants were employed by and associated with an illegal enterprise . . .." Compl. ¶ 135. Plaintiffs never describe the nature, form, or purpose of this alleged enterprise, or whether it threatens long term activity. That is insufficient. *See Boyle v. United States*, 556 U.S. 938, 946 (2009) (an enterprise must have "a purpose, relationships among those associated with the

enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."). The Complaint never alleges racketeering activity in any context broader than plaintiffs' individual LPI transactions. "As a result, the alleged 'enterprise' was a group simply conspiring to commit a fraud and not functioning as a racketeering organization." *Millette*, 2008 WL 5054741, at *5. "Furthermore, the actors in this alleged enterprise have commercial relationships and it is not clear whether the parties entered into the alleged agreement for their own gain or benefit." *Id*. Under this Court's precedent, therefore, plaintiffs have not alleged a viable enterprise.

### D. Plaintiffs Fail To State A Claim For Conspiracy To Violate RICO

To plead a RICO conspiracy claim, plaintiffs must allege "an illegal agreement to violate a substantive provision of the RICO statute." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004). Where, as here, a substantive RICO claim fails (for the reasons set forth above), the RICO conspiracy claim must also fail where "the RICO conspiracy adds nothing." *Id*. Moreover, their RICO conspiracy claim contains no new allegations, and accordingly, should be dismissed. *See Dysart v. BankTrust,* 516 F. App'x 861, 865 (11th Cir. 2013).

## VI. PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT

As this Court previously held, "[u]njust enrichment is an equitable cause of action that is unavailable where the underlying wrongs are properly addressed by a legal remedy." *Licul v. Volkswagen Grp. of Am., Inc.*, 2013 WL 6328734, at *7 (S.D. Fla. Dec. 5, 2013). "[W]here the unjust enrichment claim relies upon the same factual predicates as plaintiffs' legal causes of action, it is not a true alternative theory of relief but rather is duplicative those legal causes of action." *Id*. This Court's analysis in *Licul* is apt here —"Plaintiffs' unjust enrichment claim is a vague catch-all that does no more than incorporate by reference the alleged wrongdoing already addressed by their other legal causes of action, and thus should be dismissed as duplicative." *Id*. In support of their unjust enrichment claim, plaintiffs allege that SLS was unjustly enriched "in the form of unwarranted kickbacks," Compl. ¶ 101, and because the LPI "cost less than what SLS actually paid for them." *Id.* ¶ 102. This is simply a rehash of the factual allegations that plaintiffs offer in support of their six other causes of action against SLS. Suffice to say, "[p]laintiffs make no effort to distinguish the 'misconduct' and 'unfair and deceptive conduct' supporting their unjust enrichment claim from the alleged wrongdoing in their FDUTPA [and, here, other] claim[s]." *Licul*, 2013 WL 6238734, at *7. Because "[p]laintiffs' unjust enrichment

claim merely restates their other causes of action, it fails as a matter of law." *Id*. at *8.

The unjust enrichment claim separately fails because the Complaint does not allege any facts showing an unjust direct payment by plaintiffs to SLS. *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1287 (11th Cir. 2015). Here, plaintiffs allege that *ASIC* (and not plaintiffs) purportedly conferred the allegedly improper "kickbacks" and other financial benefits to SLS. Compl. ¶¶ 111-12. Plaintiff's unjust enrichment claim fails for lack of a direct payment from the plaintiff to SLS. *See City of Miami*, 800 F.3d at 1287; *Kunzelmann*, 2013 WL 139913, at *6. Finally, the claim fails because express contracts govern the subject of the dispute. *See Validsa, Inc. v. PDVSA Servs., Inc.*, 424 F. App'x 862, 873 (11th Cir. 2011). Here, the Mortgages and ASIC policies are express contracts that exclusively govern any relief to plaintiffs.

## VII. PLAINTIFFS HAVE NOT PLED A FDUTPA CLAIM.

For purposes of FDUTPA, "deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably within the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). Here, as described in Section V.A., a discussion which SLS incorporates here, plaintiffs have failed to show how a reasonable consumer could have been misled by SLS's alleged actions. SLS repeatedly disclosed to plaintiffs that if they breached their Mortgages by failing to maintain adequate insurance, SLS would purchase insurance to protect lender's rights and that the cost "is likely to be much higher than the cost of coverage you could obtain on your own." Wilson Decl. (Patel) at Ex. 1. Because plaintiffs have not identified representations that would mislead a reasonable person, the FDUTPA claim should be dismissed. *See Costa v. Kerzner Intern. Resorts, Inc.*, 2011 WL 2519244 (S.D. Fla. June 23, 2011). When confronted with almost identical allegations, the Eleventh Circuit found that Wells Fargo did not engage in bad faith when it "disclosed that [plaintiff] would incur higher costs if it force-placed the insurance for her." *Feaz*, 745 F.3d at 1110-11. Similarly, when faced with an LPI claim under Illinois' counterpart to FDUTPA, the Seventh Circuit found that "[t]he loan agreement and . . . disclosures, notices, and correspondence conclusively defeat any claim of fraud, false promise, concealment, or misrepresentation." *Cohen*, 735 F.3d at 608-09.

## CONCLUSION

For the foregoing reasons, the Court should enter an order granting this Motion and dismissing the Complaint.

Respectfully submitted,

CARLTON FIELDS JORDEN BURT, P.A.

By: /s/ Frank G. Burt
Frank G. Burt (Fla. Bar No. 197963)
fburt@carltonfields.com
W. Glenn Merten (*pro hac vice forthcoming*)
gmerten@carltonfields.com
Richard D. Euliss (*pro hac vice forthcoming*)
reuliss@carltonfields.com
1025 Thomas Jefferson Street NW
Suite 400 East
Washington, DC 20007
Telephone: (202) 965-8100
Facsimile: (202) 965-8104

Farrokh Jhabvala (Fla. Bar No. 765155)
fjhabvala@cfjblaw.com
Irma Reboso Solares (Fla. Bar No. 797073)
isolares@carltonfields.com
100 S.E. Second Street
Miami Tower, Suite 4200
Miami, Florida 33131-2113
Telephone: (305) 530-0050
Facsimile: (305) 530-0055

*Attorneys for Defendant Specialized Loan Servicing LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Defendant Specialized Loan Servicing LLC's Motion to Dismiss was served on all counsel of record electronically via CM/ECF, on February 16, 2016.

*/s/ Frank Burt*
Frank Burt

**SERVICE LIST**

*Pankaj Patel and Laketha Wilson v. Specialized Loan Servicing LLC and American Security Insurance Company*, Case No. 15-cv-62600-JIC

Adam M. Moskowitz, Esq.
amm@kttlaw.com
Thomas A. Tucker Ronzetti, Esq.
tr@kttlaw.com
Rachel Sullivan, Esq.
rs@kttlaw.com
Robert J. Neary, Esq.
rn@kttlaw.com
**KOZYAK TROPIN & THROCKMORTON**
2525 Ponce de Leon Boulevard
Suite 900
Coral Gables, FL 33134-6036
Tel: (305) 372-1800 / Fax: (305) 372-3508

*Counsel for Plaintiffs*

Lance August Harke, Esq.
lharke@harkeclasby.com
Sarah Clasby Engel, Esq.
sengel@harkeclasby.com
Howard Mitchell Bushman, Esq.
hbushman@harkeclasby.com
**HARKE CLASBY & BUSHMAN LLP**
9699 NE Second Avenue
Miami Shores, FL 33138
Tel: (305) 536-8222 / Fax: (305) 536-8229

*Counsel for Plaintiffs*

Aaron Samuel Podhurst, Esq.
apodhurs@podhurst.com
Peter Prieto, Esq.
pprieto@podhurst.com
John Gravante, III, Esq.
jgravante@podhurst.com
Matthew Weinshall, Esq.
mweinshall@podhurst.com
**PODHURST ORSECK, P.A.**
City National Bank Building
25 W Flagler Street, Suite 800
Miami, FL 33130-1780
Tel: (305) 358-2800 / Fax: (305) 358-2382

*Counsel for Plaintiffs*

Archie Cleveland Lamb, Jr., Esq.
alamb@archielamb.com
**ARCHIE LAMB, ASSOCIATES**
P.O. Box 2088
Birmingham, AL 35201
Tel: (205) 612-6789 / Fax: (205) 314-0785

*Counsel for Plaintiffs*